UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

Case No. 23-14169-SMG
Retailing Enterprises, LLC,                       Chapter 11

                    Debtor.
_____/

### DEBTOR'S AMENDED PLAN OF REORGANIZATION

Wernick Law, PLLC
*Attorneys for the Debtor*
Aaron A. Wernick, Esq.
2255 Glades Road, Suite 324A
Boca Raton, Florida 33431
(561) 961-0922
awernick@wernicklaw.com

# TABLE OF CONTENTS

ARTICLE I Definitions .................................................................................................2

ARTICLE II Classification of Claims and Interests..................................................8

ARTICLE III Treatment of Claims and Interests Under the Plan...........................8

ARTICLE IV Impairment ..........................................................................................42

ARTICLE V Means of Execution and Security for Payments.....................................43

ARTICLE VI Executory Contracts ...........................................................................45

ARTICLE VII Claimants and Impaired Interest Holders.........................................49

ARTICLE VIII Cram Down and Modification ..........................................................50

ARTICLE IX Duties and Fees Owed to the Office of the U.S. Trustee …...……....…………...52

ARTICLE X Effect of Confirmation..........................................................................52

ARTICLE XI Post-Confirmation Reorganized Debtor's Structure ..............................57

ARTICLE XII Retention of Jurisdiction ....................................................................59

ARTICLE XIII Miscellaneous………………………………………….…………………61

## DEBTOR'S AMENDED PLAN OF REORGANIZATION

RETAILING ENTERPRISES, LLC (the "Debtor" or "Reorganized Debtor"), hereby proposes its Amended Plan of Reorganization (the "Plan") pursuant to Section 1121 of the United States Bankruptcy Code. Debtor has also done business as "Techno Marine Store", "Invicta Stores USA", "Invicta", and "Invicta Store".

In summary, but subject to the more specific details provided herein, the Plan provides the emergence of the Debtor from its Chapter 11 Case with the debtor in possession, Retailing Enterprises, LLC, as the Reorganized Debtor. The Debtor will own its Assets. The treatment and satisfaction of all Allowed Claims against the Debtor and Allowed Equity Interests in the Debtor are set forth in this Plan.

Reference is made to the Disclosure Statement (the "Disclosure Statement") accompanying this Plan for a discussion of, among other things, Debtor's history, business, events leading up to this Chapter 11 Case, treatment of Claims against and Equity Interests in Debtor, risk factors, liquidation analysis, alternatives to the Plan, a summary and analysis of this Plan, and certain related matters.

**ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE HEREON ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

**SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3018, AND IN THIS PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THIS PLAN PRIOR TO CONFIRMATION OF THE PLAN OR ITS SUBSTANTIAL CONSUMMATION.**

**IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN CONTEMPLATES A GREATER**

DocuSign Envelope ID: BB7D2F16-E785-4736-AB16-28B8C86EB43C

**RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, AND THE DEBTOR RECOMMENDS THAT CREDITORS AND HOLDERS OF EQUITY INTERESTS VOTE TO ACCEPT THE PLAN.**

**NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN AND IN THE ACCOMPANYING DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTOR'S BUSINESS, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTOR'S BUSINESS, THE PROJECTIONS FOR THE FUTURE REORGANIZATION OF THE DEBTOR, TRANSACTIONS TO WHICH THE DEBTOR WAS A PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE DEBTOR, ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTOR AND ITS MANAGEMENT AND NOT TO ANY OTHER PARTY, INCLUDING PROFESSIONALS ENGAGED BY THE DEBTOR OR THE ESTATE.**

ARTICLE I
DEFINITIONS

For the purposes of this Plan and to the extent not otherwise provided herein, the terms below shall have the respective meanings hereinafter set forth and, unless otherwise indicated, the singular shall include the plural, and capitalized terms shall refer to the terms as defined in this Article and, any term used in the Plan which is not defined below, but which is used in the Bankruptcy Code, shall have the meaning assigned to it in the Bankruptcy Code.

1.1    "Administrative Claim" shall mean a Claim against the estate of Debtor allowed by order of the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a) of the Bankruptcy Code, or incurred by Debtor in Debtor's ordinary course of business from

the Petition Date to the Confirmation Date, and shall include all fees payable pursuant to Section 1930 of Title 28 of the United States Code.

1.2    "Allow", "Allowed", "Allowance" or words of similar meaning shall mean with respect to a Claim against the estate of Debtor that no objection has been interposed within the applicable period of limitation fixed by this Plan or by the Bankruptcy Court and that such period of limitation has expired; or that the Claim has been allowed by an order of the Bankruptcy Court that is no longer subject to appeal or certiorari and as to which no appeal or certiorari is pending.

1.3    "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as amended, Title 11 of the United States Code, which governs the Chapter 11 case of Debtor.

1.4    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Florida having jurisdiction over the Chapter 11 case of Debtor or the United States District Court for the Southern District of Florida having jurisdiction over any part or all of the Chapter 11 case of Debtor in respect of which the reference has been withdrawn pursuant to Section 157(d) of Title 28 of the United States Code.

1.5    "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court (including any applicable local rules of the United States District Court for the Southern District of Florida) as now in effect or hereafter amended.

1.6    "Business Day" shall mean a day other than a Saturday, Sunday, or legal holiday.

1.7    "Cash" shall mean legal tender of the United States or its equivalents, including but not limited to bank deposits, checks, and other similar items.

1.8    "Claim" shall have the meaning provided for such term in section 101(5) of the Bankruptcy Code.

1.9    "Claims Administrator" shall come into existence upon confirmation of the Plan and shall be the Committee.

1.10    "Confirmation Date" shall mean the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

1.11    "Confirmation Order" shall mean a final order of the Bankruptcy Court confirming the provisions of this Plan, pursuant to section 1129 of the Bankruptcy Code.

1.12    "Confirmation Hearing" shall mean the hearing at which the Court confirms the Plan.

1.13    "Committee" shall mean the committee of creditors holding unsecured claims, appointed by the United States Trustee pursuant to 11 U.S.C. § 1102(a).

1.14    "Debtor" shall mean Retailing Enterprises, LLC, Debtor in Possession in the Chapter 11 bankruptcy proceeding currently pending in the United States Bankruptcy Court for the Southern District of Florida, Case No. 23-14169-SMG.

1.15    "Disbursing Agent" shall mean the person appointed under the Plan to administer and disburse the cash payments to be made pursuant to paragraph 5.4 of

4

the Plan. The Disbursing Agent shall be the Debtor's sole member, Mauricio Krantzberg ("Mr. Krantzberg").

1.16    "<u>Disclosure Statement</u>" shall mean the Disclosure Statement that relates to this Plan, and as approved by the Court pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be amended, modified, or supplemented (and all exhibits and schedules annexed thereto or referred to therein).

1.17    "<u>Disclosure Statement Order</u>" shall mean that certain order of the Bankruptcy Court approving, among other things, the Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, and setting various deadlines in connection with Confirmation of the Plan.

1.18    "<u>Distribution</u>" shall mean the distribution of Cash or other property, as the case may be, in accordance with this Plan.

1.19    "<u>Distribution Address</u>" shall mean the address for a holder of an Allowed Claim as set forth in a proof of claim, as amended or supplemented. If no proof of claim is filed with respect to a particular Claim, such defined term means the address as set forth in the Debtor's Schedules.

1.20    "<u>Effective Date</u>" shall mean the fifteenth day following the Confirmation Date, and in the event that such date is not a Business Day, the next day thereafter.

1.21    "<u>Equity Interest</u>" shall mean an equity security, within the meaning of section 101(16) of the Bankruptcy Code, in the Debtor.

1.22    "<u>Final Order</u>" shall mean an order of judgment of the Court, as entered on the docket of the Court, that has not been reversed, stayed, modified, or amended,

DocuSign Envelope ID: BB7D2F16-E785-4736-AB16-28B8C86EB43C

and as to which (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending, or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a motion under Section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedures in cases before the Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.23    "Impaired" shall mean an Allowed Claim that is Impaired within the meaning of section 1124 of the Code.

1.24    "Initial Payment Date" shall mean the first business day of the month following the Effective Date.

1.25    "Invicta" shall mean Invicta Watch Company of America, Inc.

1.26    "IRS" shall mean Internal Revenue Service.

1.27    "Petition Date" shall mean May 30, 2023, which was the date Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

1.28    "Plan" shall mean this amended plan of reorganization in its entirety, together with all addenda, exhibits, schedules, and other attachments hereto, in its present form or as it may be modified, amended, or supplemented from time to time.

1.29    "POC" or "Proof of Claim" shall mean a Proof of Claim(s) filed in this Chapter 11 case.

1.30    "Priority Claim" shall mean a Claim entitled to priority under section 507(a)(3)-(7) of the Bankruptcy Code.

1.31    "Priority Tax Claim" shall mean a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.32    "Rejection Claim" shall mean a Claim arising under section 502(g) of the Bankruptcy Code from the rejection under section 365 of the Bankruptcy Code, or under this Plan, of an executory contract or unexpired lease of Debtor that has not been assumed.

1.33    "Reorganized Debtor" shall mean Debtor, Retailing Enterprises, LLC, post-confirmation.

1.34    "Schedules" or "Amended Schedules" shall mean the Schedules and any Amended Schedules of assets and liabilities filed or which may be filed by Debtor with the Court in this case.

1.35    "Secured Claim" shall mean a Claim that is (a) secured by a valid and perfected lien on property in which Debtor's Estate has an interest, but only to the extent of the value of the Claimant's interest in the Estate's interest in such property as determined pursuant to Section 506(a) of the Bankruptcy Code or (b) subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the amount subject to setoff, as determined pursuant to section 553 of the Bankruptcy Code.

1.36    "United States Trustee" shall mean the Assistant United States Trustee

for the Southern District of Florida.

1.37 <u>Unsecured Claim</u>" shall mean any Claim that is not (a) an Administrative Claim, (b) a Priority Claim; (c) a Priority Tax Claim; or (d) a Secured Claim.

## ARTICLE II
### CLASSIFICATION OF CLAIMS AND INTERESTS

2.1 An Allowed Claim is part of a particular class only to the extent that the Allowed Claim qualifies within the definition of that Class, and is in a different Class to the extent that the remainder of the Claim qualifies within the description of a different Class.

## ARTICLE III
### TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

3.1 <u>General</u>. Unless otherwise specified, all payments under this Plan shall commence on the Initial Payment Date.

3.2 <u>Administrative Claims</u>. All Allowed Administrative Claims shall be paid (a) in full on the Effective Date or, if such expense is objected to, the date of a final order allowing any such Administrative Claim, whichever is later, or (b) upon such other terms as may be agreed to between Debtor and each such administrative claimant.

An Administrative Claim is "allowed" if, at a minimum, a claimant/creditor requests payment by the Administrative Claims Bar Date (defined below), with the exception of (a) Debtor's counsel and other estate professionals, who shall final a Fee Application by the deadline set by the Court, approximately 21 days before the Plan

DocuSign Envelope ID: BB7D2F16-E785-4726-AB16-28D9C86EB43C

Confirmation Hearing; (b) the Office of the U.S. Trustee; and (c) the clerk of the Bankruptcy Court. All administrative expenses are subject to Court approval. All administrative expenses will be paid from Debtor's Cash on hand and/or future net revenue from the continued operation of Debtor's business, unless otherwise stated.

**ADMINISTRATIVE CLAIMS BAR DATE**: All requests for payment of Administrative Claims, other than with respect to applications for payment of professional fees, UST fees, and Court costs, shall be filed with the Court and served upon Debtor at least **three days before the Confirmation Hearing**, or by such earlier deadline as may apply to such Administrative Claim pursuant to an order of the Court. Except as provided herein, any Administrative Claim for which an application or request for payment is not filed within such time period shall be discharged and forever barred.

3.3 All fees due under 11 U.S.C. §1129(a)(12) shall be paid as required by 28 U.S.C. §1930.

3.4 <u>Priority Tax Claims and Priority Claims</u>. Priority tax claims are assessed, unsecured income, employment, and other taxes as described by Section 507(a)(8) of the Bankruptcy Code.

Allowed Priority Tax Claimholders shall receive deferred payments over a period not to exceed five (5) years from the Petition Date, of a value, as of the Effective Date of the Plan, equal to the amount of the Allowed Priority Tax Claim, plus statutory interest. Debtor may pay any or all amount of said claims before such date and not incur a prepayment penalty.

| Payee | Approximate Claim Amount |
|---|---|
| Arizona DOR | $0.00 |
| City of Hyattsville | $7,306.87 |
| Clark County Nevada Tax Collector | $722.24 |
| Comptroller of Maryland. | $22,646.24 |
| Florida DOR | $321,283.02 |
| Fulton County Tax Collector | $6,575.14 |
| Georgia Department of Revenue | $49,161.81 |
| Miami Dade County Tax Collector | $1,421.10 |
| Miami Dade County Tax Collector | $4,935.00 |
| NYC Department of Finance | $165,328.08 |
| Orange County Tax Collector | $3,962.57 |
| Orange County Tax Collector | $3,987.86 |
| Orange County Tax Collector | $868.19 |
| Sarasota County Tax Collector | $1,056.19 |

3.5 <u>Classification of Claims</u>.

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of the Classes of Claims and Equity Interests in and of the Debtor. A Claim or Equity Interest is placed in a particular Class only to the extent that such Claim or Equity Interest is an Allowed Claim or Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, or otherwise settled or paid prior to the Effective Date. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in Section 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and are deemed not to be Impaired.

The treatment of and consideration to be received by holders of Allowed Claims and the treatment of Equity Interests pursuant to this Article III shall be in full

satisfaction, settlement, release, and extinguishment of their Allowed Claims against, or Equity Interests in Debtor, and Debtor's Estate, except as otherwise expressly provided for in this Plan or the Confirmation Order.

## Class 1 - Allowed Secured Claim of City National Bank of Florida – Revolving Note

*Class Description*: Class 1 consists of the Allowed secured claim of City National Bank of Florida ("CNB") against the Debtor based on a revolving promissory note (the "Revolving Note"). The Revolving Note was issued in December 2021 with a limit of $4,200,000.00. The balance as of the Petition Date is $4,244,547.59, which consists of a principal balance in the amount of $4,200,000.00, interest in the amount of $43,720.72, and late charges in the amount of $826.87. This loan is secured by all assets of the Debtor and is cross collateralized with the 2021 Note and the 2023 Note.

The contractual payment terms were as follows: Commencing December 29, 2021, the Debtor was to make interest-only monthly payments at the Prime rate through the maturity date of December 29, 2024, at which time the $4,200,000.00 full balance would be due. In addition, there was a prepayment penalty of 2% of the amount repaid until December 29, 2023, and then a 1% penalty from December 30, 2023 through the maturity date.

This loan was guaranteed by (a) Retailing Enterprises PR, LLC ("RE PR"), the Debtor's wholly-owned subsidiary in Puerto Rico; (b) Mr. Krantzberg, individually; (c) The Watch Brand Company, LLC ("Watch Brand"), a wholly-owned subsidiary of the Debtor; (d) 205, LLC ("205"), a wholly-owned subsidiary of the Debtor; and (e) Newport Venture Limited ("Newport"), under a Pledged Collateral Agreement. In

11

addition, there exists a subordination of debt and inventory buy back agreement by and between the Debtor, Invicta, and CNB (the "Invicta Subordination Agreement").

_Treatment_: The Debtor will make no further payments on CNB's Revolving Note, which debt has been satisfied in full. In accordance with the settlement terms agreed to by the Debtor and CNB during the parties' post-petition judicial settlement conference (the "CNB JSC"), CNB liquidated Newport's securities brokerage account on or around November 10, 2023 in the amount of $5,901,009.90 (the "Newport Proceeds"). On or around November 17, 2023, CNB applied a portion of the Newport Proceeds to the Revolving Note, which reduced the outstanding balance payable on the Revolving Note to $0. No prepayment penalty was charged by CNB, notwithstanding CNB's contractual right to a 2% penalty.

_Impairment_: This Class is impaired, and the Class 1 Claimholder is entitled to vote to accept or reject the Plan.

**Class 2 - Allowed Secured Claim of City National Bank of Florida – 2021 Note**

_Class Description_: Class 2 consists of the Allowed secured claim of CNB against the Debtor based on a promissory note issued in 2021 (the "2021 Note"). The underlying loan had a balance of $2,734,462.19 as of the Petition Date, consisting of the principal balance of $2,721,892.30, interest of $10,287.42, and late charges of $2,282.47. The loan had a fixed interest rate of 4.25% on a five-year full amortization schedule, maturing on December 29, 2026.

This loan is secured by all assets of the Debtor and is cross collateralized with the Revolving Note and the 2021 Note. This loan is guaranteed by RE PR, Mr.

Krantzberg, Watch Brand, 205, and Newport (under a Pledged Collateral Agreement). In addition, there exists the Invicta Subordination Agreement.

There is a prepayment penalty of 4% until December 29, 2023, with the prepayment penalty decreasing by one percentage point each subsequent year through maturity.

As of the date of the filing of this Plan, the monthly payment is $29,892.89. The Debtor is current on this loan.

As part of the agreement reached in the CNB JSC, CNB applied the Newport Proceeds to the loans in Classes 1 and 3, which were then paid in full, plus fees for CNB's counsel in the amount of $200,000, leaving a balance for this Class 2 claim in the amount of $1,708,540.00[1] (the "CNB Remaining Balance").

_Treatment_: The remaining terms of CNB's 2021 Note are modified as follows:

The line of credit will be converted to a commercial loan, and the interest rate will be fixed at 4.25%.

Commencing on the Effective Date, the Debtor will make interest-only monthly payments based on the CNB Remaining Balance through and including December 2024. Commencing January 2025, the Debtor will make principal and interest monthly payments as listed in **Exhibit "A" Plan Financials Section 16** attached to the Disclosure Statement, through and including December 2026. On December 31, 2026, any outstanding amounts due and owing under this loan will be paid as a

---

[1] This is the outstanding balance as of November 17, 2023. Additional principal and interest payments will be paid prior to Confirmation. The principal payments will reduce the amount owed at Confirmation.

balloon payment.

All prepayment penalty provisions will be eliminated; that is, the Debtor may prepay any amount of this loan without penalty.

Except as modified herein, the remaining terms of the prepetition loan documents will remain unchanged, and the Debtor's obligations under the prepetition loan documents shall continue post-Confirmation.[2]

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

## Class 3 - Allowed Secured Claim of City National Bank of Florida – 2023 Note

*Class Description*: Class 3 consists of the Allowed secured claim of CNB against the Debtor based on a promissory note issued in 2023 (the "2023 Note"). The underlying loan had a balance of $737,694.17 as of the Petition Date, consisting of a principal balance of $735,350.87 plus Allowed interest and fees, minus payments made by the Debtor not yet applied. The loan had a fixed interest rate of 7.15% on a two-year full amortization schedule, maturing on February 28, 2025.

This loan was secured by all assets of the Debtor and cross collateralized with the Revolving Note and the 2021 Note. There is no prepayment penalty. This loan was guaranteed by RE PR, Mr. Krantzberg, Watch Brand, and Newport (under a Pledged Collateral Agreement). In addition, there exists the Invicta Subordination Agreement.

---

[2] In addition, Newport shall retain its subrogation rights under section 509(a) of the Bankruptcy Code in the amount of the Newport Proceeds ($5,901,009.90) as Newport was liable with the Debtor on this loan, secured and paid said claim, and thus is subrogated to the rights of CNB to the extent of the payment of the Newport Proceeds.

As of November 1, 2023, the monthly payment was $37,398.04. The Debtor is current on this loan.

*Treatment*: The Debtor will make no further payments on CNB's 2023 Note, which debt has been satisfied in full. In accordance with the settlement terms agreed to by the Debtor and CNB during the CNB JSC, CNB liquidated Newport's securities brokerage account on or around November 10, 2023. On or around November 17, 2023, CNB applied the proceeds from that securities account to the 2023 Note, which proceeds satisfied in full the outstanding balance due on the 2023 Note. No prepayment penalty was charged by CNB, notwithstanding CNB's contractual right to a 2% penalty.

*Impairment*: This Class is impaired and the Class 3 Claimholder is entitled to vote to accept or reject the Plan.

### Class 4 – Allowed Secured Tax Claim of Bexar County Tax Collector

*Class Description*: Class 4 consists of the Allowed Secured Tax Claim of Bexar County Tax Collector (and for those taxing entities for which Bexar County collects ad valorem taxes). Bexar County Tax Collector filed Proof of Claim No. 4 in the amount of $14,817.18 for Ad Valorem Taxes with a 12% annual statutory interest rate. Bexar County Tax Collector estimates the value of the property securing its claim is $257,770.00.

*Treatment*: The Class 4 Claimholder will receive deferred cash payments over a period not to exceed five (5) years from the Petition Date, as follows. The Reorganized Debtor shall pay Bexar County $14,817.18 through equal, consecutive

15

monthly installments, with the first payment being made on the first day of the first full month following the Effective Date, amortized over a period not to exceed five (5) years from the Petition Date. Post-petition interest will accrue at the rate of twelve percent (12%) per annum from the Petition Date until the Effective Date, and thereafter, Plan interest at the rate of twelve percent (12%) per annum shall accrue on the entire balance until the tax debt is paid in full. The appraised value of the property securing the Bexar County claim is $257,770.00.

The Reorganized Debtor may pre-pay the pre-petition tax debt to the taxing authorities at any time. The Bexar County tax claim shall retain its statutory lien securing its pre-petition and any post-petition tax debts until such time as the tax debts are paid in full. The Reorganized Debtor shall pay all post-petition ad valorem tax liabilities (tax year 2024 and subsequent tax years) owing to Bexar County in the ordinary course of business as such tax debt comes due and prior to said ad valorem taxes becoming delinquent without the need of the taxing authorities to file an administrative expense claim and/or request for payment pursuant to 11 U.S.C. § 503(b)(1)(D).

Should the Reorganized Debtor fail to make any payments as required in this Plan, Bexar County shall provide written notice of that default to the Reorganized Debtor and Debtor's attorney advising of that default, and providing the Reorganized Debtor with a period of fifteen (15) days to cure the default. In the event that the default is not cured within fifteen (15) days, Bexar County may, without further order of this Court or notice to the Reorganized Debtor, pursue all of its rights and remedies

available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. Additionally, the failure to timely pay post-petition and/or post-confirmation taxes while the Reorganized Debtor is still paying any pre-petition debt, shall be considered an event of default. Bexar County shall provide Reorganized Debtor and its attorney with written notice of that default and afford a fifteen (15) day opportunity to cure said default. In the event that the Reorganized Debtor fails to timely cure the post-petition and/or post-confirmation default, Bexar County may, without further order of this court or notice to the Reorganized Debtor, pursue all of its rights and remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. The Reorganized Debtor shall be entitled to no more than three (3) Notices of Default. In the event of a fourth (4th) default, Bexar County may pursue all rights and remedies available to it under the Texas Property Tax Code in state district court without further order of this court or further notice to the Reorganized Debtor.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

## Class 5 – Allowed Secured Tax Claims of Prince George's County, Maryland

*Class Description*: Class 5 consists of the Allowed Secured Tax Claim of Prince George's County, Maryland. Prince George's County, Maryland filed Proof of Claims Nos. 2 and 3 in the amounts of $16,484.18 and $13,745.10, respectively.

*Treatment*: The Allowed Secured Tax Claimholder will receive deferred cash payments over a period not to exceed five (5) years from the Petition Date, of a value,

as of the Effective Date of the Plan, equal to the amount of the Allowed Claims, plus statutory interest.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

## Class 6 – Allowed Secured Tax Claim of Dekalb County Tax Commissioner

*Class Description*: Class 6 consists of the Allowed Secured Tax Claim of Dekalb County Tax Commissioner. The Dekalb County Tax Commissioner filed Proof of Claim No. 29 for $10,344.52 with a 0.05% variable annual interest rate. The Dekalb County Tax Commissioner estimated the value of the property securing its claim is $597,033.00.

*Treatment*: The Allowed Secured Tax Claimholder will receive deferred cash payments over a period not to exceed five (5) years from the Petition Date, of a value, as of the Effective Date of the Plan, equal to the amount of the Allowed Claim, plus statutory interest.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

## Class 7 – Allowed Secured Tax Claim of County of Hays, Texas

*Class Description*: Class 7 consists of the Allowed Secured Tax Claim of County of Hays, Texas, for its own property taxes and for the taxing entities for which County of Hays, Texas collects ad valorem taxes. The creditor filed Proof of Claim No. 32 for $6,547.75 with a 12% fixed annual interest rate, estimating the value of the property securing its claim at $296,510.00, and listing that the amount necessary to cure any

default as of the Petition Date is $3,546.06.

*Treatment*: The Allowed Claimholder will receive deferred cash payments over a period not to exceed five (5) years from the Petition Date, as follows. The amount of $6,547.75 will be paid in full through equal, consecutive monthly installments, with the first payment being made on the first day of the first full month following the Effective Date amortized over a period not to exceed five (5) years from the Petition Date. Post-petition interest will accrue at the rate of twelve percent (12%) per annum from the Petition Date until the Effective Date, and thereafter, Plan interest at the rate of twelve percent (12%) per annum shall accrue on the entire balance until the tax debt is paid in full. The 2023 appraised value of the property securing the Allowed Secured Tax Claim of County of Hays, Texas is $339,010.00.

The Reorganized Debtor may pre-pay the pre-petition tax debt to the taxing authorities at any time. The County of Hays, Texas shall retain its statutory lien securing its pre-petition and any post-petition tax debts until such time as the tax debts are paid in full. The Reorganized Debtor shall pay all post-petition ad valorem tax liabilities (tax year 2024 and subsequent tax years) owing to County of Hays, Texas in the ordinary course of business as such tax debt comes due and prior to said ad valorem taxes becoming delinquent without the need of the taxing authorities to file an administrative expense claim and/or request for payment pursuant to 11 U.S.C. § 503(b)(1)(D).

Should the Reorganized Debtor fail to make any payments as required in this Plan, County of Hays, Texas shall provide written notice of that default to the

DocuSign Envelope ID: BB7D2F16-E785-4726-AB16-28D9C86EB43C

Reorganized Debtor and Debtor's attorney advising of that default and providing the Reorganized Debtor with a period of fifteen (15) days to cure the default. In the event the default is not cured within fifteen (15) days, County of Hays, Texas may, without further order of this Court or notice to the Reorganized Debtor, pursue all of its rights and remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. Additionally, the failure to timely pay post-petition and/or post-confirmation taxes while the Reorganized Debtor is still paying any pre-petition debt, shall be considered an event of default. The County of Hays, Texas shall provide Reorganized Debtor and its attorney with written notice of that default and afford a fifteen (15) day opportunity to cure said default. In the event the Reorganized Debtor fails to timely cure the post-petition and/or post-confirmation default, County of Hays, Texas may, without further order of this court or notice to the Reorganized Debtor, pursue all of its rights and remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. The Reorganized Debtor shall be entitled to no more than three (3) Notices of Default. In the event of a fourth (4th) default, County of Hays, Texas may pursue all rights and remedies available to it under the Texas Property Tax Code in state district court without further order of this court or further notice to the Reorganized Debtor.

    *Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 8 – Allowed Secured Tax Claims of Hillsborough County Tax Collector**

*Class Description*: Class 8 consists of the Allowed Secured Tax Claims of the Hillsborough County Tax Collector. The Tax Collector filed the following Proofs of Claim:

- Proof of Claim No. 36 for $1,477.33 with an 18% fixed annual interest rate for estimated 2023 tangible property taxes;

- Proof of Claim No. 37 for $1,849.78 with an 18% fixed annual interest rate for 2022 tangible property taxes;

- Proof of Claim No. 38 for $3,420.06 with an 18% fixed annual interest rate for 2022 tangible property taxes; and

- Proof of Claim No. 39 for $2,738.60 with an 18% fixed annual interest rate for estimated 2023 tangible property taxes.

On Proofs of Claims Nos. 36 and 37, the Tax Collector estimated the value of the property securing its claims at $109,390.00, and on Proof of Claim Nos. 38 and 39, estimated the value of the property securing its claims at $166,800.00.

*Treatment*: The Allowed Claimholder will receive deferred cash payments over a period not to exceed five (5) years from the Petition Date, of a value, as of the Effective Date of the Plan, equal to the amount of the Allowed Claims, plus statutory interest.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 9 – Allowed Secured Tax Claim of San Marcos CISD**

*Class Description*: Class 9 consists of the Allowed Secured Tax Claim of San Marcos CISD based on ad valorem taxes. San Marcos CISD filed Proof of Claim No. 42 for $7,160.60 with a 12% fixed annual interest rate.

*Treatment*: The Allowed Claimholder will receive deferred cash payments over a period not to exceed five (5) years from the Petition Date, of a value, as of the Effective Date of the Plan, equal to the amount of the Allowed Claim, plus statutory interest.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 10 – Allowed Secured Tax Claims of Broward County Tax Collector**

*Class Description*: Class 10 consists of the Allowed Secured Tax Claims of the Broward County Tax Collector. The Tax Collector filed the following Proofs of Claim:

- Proof of Claim No. 51-1 for $8,389.92 with an 18% fixed annual interest rate for 2022 tangible property taxes; and

- Proof of Claim No. 52-2 for $9,653.97 with an 18% fixed annual interest rate, beginning April 1, 2024, for 2023 tangible property taxes;

On Proof of Claims No. 51, the Tax Collector estimated the value of the property securing its claim at $443,014.00, and on Proof of Claim No. 52, the Tax Collector estimated the value of the property securing its claim at $525,171.00.

*Treatment*: The Allowed Claimholder will receive deferred cash payments over a period not to exceed five (5) years from the Petition Date, of a value, as of the

Effective Date of the Plan, equal to the amount of the Allowed Claims, plus statutory interest.

*Impairment*: This Class is impaired, and the holder of the Allowed Claims in this Class is entitled to vote to accept or reject the Plan.

## Class 11 - Allowed Secured Claim of Ally Bank

*Class Description*: Class 11 consists of the Allowed Secured Claim of Ally Bank ("Ally's") as to a vehicle (truck) loan. As of the Petition Date, Ally's claim was $23,531.55. Ally, as indicated on Proof of Claim No. 35, estimates the value of the property securing its claim totals $20,154.25, and the fixed annual interest rate in the prepetition contract was 6.990%.

*Treatment*:  Ally Bank has elected to have its claim treated under 1111(b). Therefore, the Debtor will pay to Ally the amount of its secured claim ($23,531.55) over a period of 10 years, with the remaining balance of its claim to be paid as a balloon payment at such time. The collateral vehicle is worth $20,154.25. Pursuant to 1111(b), Ally is entitled to the nominal amount of its claim without interest. Consequently, the Debtor will pay Ally $117.40 per month for 10 years, with a balloon payment at the end of the 10-year period of the outstanding amount owed.

The Debtor may prepay any or all of the amounts owed to Ally without incurring any prepayment penalties.

*Impairment*: This Class is impaired, and the holder of Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

## Class 12- Allowed Secured Claim of Dell Financial Services

*Class Description*: Class 12 consists of the Allowed Secured Claim of Dell Financial Services ("Dell") against the Debtor. As of the Petition Date, Dell held a claim for $24,515.38 based on purchase money security interests secured by the Debtor's computers.

*Treatment*: Except to the extent that the Claimholder has been paid before the Effective Date or agrees to a different treatment, the Claimholder will be paid the secured amount of its claim over 5 years, fully amortized, at an annual interest rate of 5%, for a monthly payment of $462.64, commencing on the first of the month following the Effective Date. The new 5-year amortization period will begin on the Effective Date.

There will be no prepayment penalty in the event Debtor pays all or a portion of the unpaid principal balance before the maturity date. Except as modified herein, the remaining terms of the prepetition loan documents will remain unchanged.

*Impairment*: This Class is impaired, and the holder of Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 13 – Allowed Claim of Invicta**

*Class Description*: Class 13 consists of the Allowed Claim of Invicta based on the Debtor's assumption of the Distribution Agreement dated May 14, 2019 and the unpaid balance owed to Invicta as of the Petition Date. As reflected in Debtor's Schedules, Debtor estimates Invicta's Allowed Claim totals $31,132,626.33 (the "Invicta Claim"). Pursuant to the Distribution Agreement, Invicta is the manufacturer, and the Debtor is the distributor of Invicta-brand products.

In the Debtor's ordinary course of business, the Debtor purchases inventory from Invicta on 120–150-day terms. No interest is charged for this arrangement. On average, $500,000-$1,200,000 of product is delivered to Debtor per week, and a similar amount is paid weekly to Invicta. The usual and customary practice of the parties is that weekly payments are applied to the oldest invoices first.

_Treatment_: The Debtor shall assume the Distribution Agreement with Invicta as modified herein, which modifications and assumption are subject to confirmation of this Plan. The Reorganized Debtor will pay Invicta $30,000,000.00 over ten (10) years, which amount is payable in yearly installments of $3,000,000.00 (the "Annual Payment") and accrues interest at 6.5% per annum. The Annual Payment is due on the 31st of December, beginning December 31, 2024, and ending December 31, 2034. A balloon payment for the accrued interest is due December 31, 2034. However, if the Reorganized Debtor does not default on any of the Annual Payments, Invicta will waive the accrued interest.

If the Reorganized Debtor purchases a minimum of $40,000,000.00 in finished inventory from Invicta per year (pre-paid/C.O.D.), Invicta will give the Reorganized Debtor an annual $3,000,000.00 rebate, which rebate the Debtor may apply to reduce the Invicta Claim by $3,000,000.00 each year (i.e. the Reorganized Debtor will not make its Annual Payment). Therefore, as long as the Reorganized Debtor continues to purchase said minimum amount for 10 years[3], the Invicta Claim will be reduced to

---

[3] Any remaining amount over $30,000,000.00, estimated to be $831,801.33, will be deducted the following year as long as the Debtor purchases its annual minimum.

zero and Invicta will receive no distribution under the Plan. The Reorganized Debtor may not satisfy the minimum purchase amount of $40,000,000.00 in any given year by carrying over payments above $40,000,000.00 from a prior year. Moreover, the Debtor must make its purchases of Invicta product by prepayment or by cash on delivery.

If the Reorganized Debtor does not purchase a minimum of $40,000,000.00 in finished inventory from Invicta in any single calendar year, then the following rebate structure shall apply:

(i)      For $35,000,000.00 to $39,999,999.00 in purchases in a given year, Invicta will give the Reorganized Debtor with a $2,500,000.00 rebate;

(ii)     For $30,000,000.00 to $34,999,999.00 in purchases in a given year, Invicta will give the Reorganized Debtor with a $2,000,000.00 rebate; and

(iii)     For purchases less than $30,000,000.00 in a given year, Invicta will not give the Reorganized Debtor any rebate.

If the Reorganized Debtor defaults on its payment obligations to Invicta, under the terms of this Plan or the assumed Distribution Agreement, the entire remaining balance of the Invicta Claim will become due and payable.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

### Class 14A – Allowed Claim of University Town Center for Assumed Lease:

*Class Description*: Class 14A consists of the Allowed Claim of TB Mall at UTC, LLC ("TB") for the University Town Center - Sarasota lease, which is being assumed

26

by the Debtor, as modified herein, and for which arrearage cure payments are being made (the "Assumed Lease Claim").

*Treatment*: The Assumed Lease Claim in the amount of $14,923.85 shall be paid in 2 monthly installments of $7,461.93, commencing on the Initial Payment Date[4]. The total monthly occupancy costs shall be reduced to $7,711.00 [$6,666.67 rent + $1,044.00 other charges] and the lease term shall be extended by 5 years, to October 31, 2029. Additionally, Retailing Enterprises PR LLC will replace Island Cabo SA as guarantor of the Lease.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 14B – Allowed Claim of Simon Property Group Inc. for Assumed Leases**:

*Class Description*: Class 14B consists of the Allowed Claim of Simon Property Group Inc. ("Simon") for the Sawgrass and Orlando Outlets leases which are being assumed by the Debtor and for which arrearage cure payments are being made in the total allowed amount of $1,301,466.66: $599,365.67 and $702,100.99 respectively (the "Assumed Leases Claim").

*Treatment*: The Assumed Leases Claim in the amount of $1,301,466.66 shall be paid in twelve (12) equal monthly installments of $108,455.56 commencing on the Initial Payment Date.

---

[4] Contrary to the assertion in POC 46-1, there are no post-petition amounts owed to this landlord as the Debtor is current on its rent payments.

DocuSign Envelope ID: BB7D2F16-E785-4726-AB16-2BD9C86EB43C

*Impairment*: This Class is impaired, and the holders of the Allowed Claim in this Class are entitled to vote to accept or reject the Plan.

**Class 14C – Allowed Claim of Palm Beach Outlets I, LLC for Assumed Lease**:

*Class Description*: Class 14C consists of the Allowed Claim of Palm Beach Outlets I, LLC for the Tanger Outlets – Palm Beach lease which is being assumed by the Debtor and for which arrearage cure payments are being made (the "Assumed Lease Claim").

*Treatment*: The Assumed Lease Claim in the amount of $8,874.00 shall be paid in 2 monthly installments of $4,437.00, commencing on the Initial Payment Date.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 14D – Allowed Claim of El Paso Outlet Center CMBS, LLC for Assumed Lease**:

*Class Description*: Class 14D consists of the Allowed Claim of El Paso Outlet Center CMBS, LLC for the El Paso Outlet lease which is being assumed by the Debtor and for which arrearage cure payments are being made (the "Assumed Lease Claim").

*Treatment*: The Assumed Lease Claim of $10,969.96 shall be paid in 2 equal installments of $5,484.98, commencing on the Initial Payment Date, with the second payment due on the first day of the following month. The Reorganized Debtor shall also pay $9,000.00 for fees and charges.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 14E – Allowed Claims of Brookfield Properties Retail Inc. for Assumed Leases**:

*Class Description*: Class 14E consists of the Allowed Claims of Brookfield Properties Retail Inc. ("Brookfield") in connection with the Christiana Mall, Perimeter Mall, and North Star Mall leases (the "Leases") which are being assumed by the Debtor, as modified herein. Brookfield's total claims against the Debtor, for all locations, equal $3,096,076.82 (collectively, the "Brookfield Claim").

*Treatment*: Brookfield shall be paid $200,000.00 on the Initial Payment Date in full satisfaction of the Brookfield Claim. Brookfield also will be paid a $120,000.00 cash security deposit (the "Security Deposit"). The Security Deposit will be applied to all three Leases in amounts to be determined by Brookfield and incorporated in lease amendment agreements.

Rent for the Christiana Mall location shall remain unchanged, and the lease shall be extended by 3 years, to March 31, 2027, with a 4% annual increase in rent during the extended term. Rent for the North Star location shall remain unchanged, and the lease shall be extended by 5 years, to September 30, 2028, with a 4% annual increase in rent during the extended term. The expiration date for the lease for Perimeter Mall will remain unchanged; i.e., April 30, 2030.

As an additional New Value contribution, Mr. Krantzberg shall replace Island Cabo SA as guarantor of all leases with Brookfield. More specifically, Mr. Krantzberg, as additional New Value, will personally guarantee the Reorganized Debtor's payment obligations under all three leases, with such guarantee for each lease being limited in amount to one year's rent and charges (i.e. gross rental obligations) for the

subject lease plus, if applicable, all attorney's fees and costs incurred to collect default rent obligations.

The parties shall incorporate mutual releases in lease amendment agreements, which releases will include, at minimum, a release of Mr. Krantzberg and affiliates of the Debtor from alter ego, fraudulent transfer, and other clawback liabilities, and will exclude customary lease-related charges, such as accrued but unbilled and unasserted liabilities.

*Impairment*: This Class is impaired, and the holders of the Allowed Claim in this Class are entitled to vote to accept or reject the Plan.

## Class 14F– Allowed Claim of Queens Center SPE LLC Landlord for Assumed Lease:

*Class Description*: Class 14F consists of the Allowed Claim of Queens Center SPE LLC for the Queens Center – Elmhurst lease which is being assumed by the Debtor and for which arrearage cure payments are being made (the "Assumed Lease Claim").

*Treatment*: The Assumed Lease Claim in the amount of $25,621.81 shall be paid in 2 equal payments of $12,810.91, commencing 30 days after the Effective Date.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

## Class 14G – Allowed Claim of PR Prince George's Plaza LLC for Assumed Lease:

*Class Description*: Class 14G consists of the Allowed Claim of PR Prince George's Plaza LLC for the Prince George's lease which is being assumed by the

Debtor and for which arrearage cure payments are being made (the "Assumed Lease Claim").

*Treatment*: The Assumed Lease Claim in the amount of $11,916.00 shall be paid in 2 monthly installments of $5,958.00, commencing 30 days after the Effective Date. The lease term shall be extended for three (3) years, with a 3% increase in annual rent per annum. The annual, all-in rent charge for the lease is the greater of $73,500.00 or 12% in variable rent.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

## Class 14H – Allowed Claim of Brooks Shopping Centers LLC for Assumed Lease:

*Class Description*: Class 14H consists of the Allowed Claim of Brooks Shopping Centers LLC for the Cross County lease which is being assumed by the Debtor, as modified herein, and for which arrearage cure payments are being made (the "Assumed Lease Claim").

*Treatment*: The Assumed Lease Claim in the total amount of $275,000.00 shall be paid in equal monthly installments of $22,916.67 over 12 months commencing on the Initial Payment Date. The total occupancy costs shall be $13,000.00 per month for the duration of the lease. Additionally, Retailing Enterprises PR LLC will replace Island Cabo SA as guarantor of the lease.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

## Class 14I – Allowed Claim of Extend, Inc. for Assumed Contract:

*Class Description*: Class 14I consists of the Allowed Claim of Extend, Inc. for the extended warranties contract which is being assumed by the Debtor and for which arrearage cure payments are being made (the "Assumed Contract Claim").

*Treatment*: The Assumed Contract Claim of $120,000.00 shall be paid in six (6) equal monthly installments of $20,000.00 commencing on the Initial Payment Date.

*Impairment*: This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 14J – Allowed Claim of Affirm Inc. for Assumed Contract:**

*Class Description:* Class 14J consists of the Allowed Claim of Affirm Inc. for the virtual card and platform services contract which is being assumed by the Debtor and for which arrearage cure payments are being made (the "Assumed Contract Claim").

*Treatment:* The Assumed Contract Claim of $79,000.00 shall be paid in six (6) equal monthly installments of $13,166.67 commencing on the Initial Payment Date.

*Impairment:* This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 14K – Allowed Claim of Salesforce for Assumed Contract:**

*Class Description:* Class 14K consists of the Allowed Claim of Salesforce, Inc. for the marketing and email services contract which is being assumed by the Debtor and for which arrearage cure payments are being made (the "Assumed Contract Claim").

*Treatment:* The Assumed Contract Claim of $122,138.38 shall be paid in six (6) equal monthly installments of $20,356.40 commencing on the Initial Payment Date.

*Impairment:* This Class is impaired, and the holder of the Allowed Claim in this Class is entitled to vote to accept or reject the Plan.

**Class 15 – Allowed General Unsecured Claims:**

*Class Description*: Class 15 consists of the Allowed Claims of the general unsecured creditors. As reflected in the list of general unsecured creditors attached as **Exhibit "A" Plan Financials Section 20** to the Disclosure Statement, Debtor estimates the aggregate amount of Class 15 General Unsecured Claims (which does not include the Class 13 claim of Invicta nor the claim of Mr. Krantzberg, as addressed in Class 16) totals approximately $ 24,560,000.

*Treatment*: As provided in additional detail in the Liquidation Analysis, attached as Exhibit "B" to the Disclosure Statement, the Debtor estimates that if this case was converted to a Chapter 7 case, the holders of Allowed General Unsecured Claims would be paid 0% of their claims. Invicta's Allowed Claim will be paid zero and, as part of his New Value contribution, Mr. Krantzberg will waive his general unsecured claim against the Estate, which will maximize the distribution to all remaining holders of Allowed General Unsecured Claims. The Debtor estimates the elimination of Invicta's Allowed Claim in this Class substantially increases the distributions to be paid to the remaining holders of Allowed General Unsecured Claims.

Except to the extent that the holder of an Allowed General Unsecured Claim

has been paid before the Effective Date, or agrees to a different treatment, each holder of an Allowed General Unsecured Claim against the Debtor shall be paid up to 11.5% of the allowed amount of their respective general unsecured claim. Beginning on the Initial Payment Date, the Debtor will make equal quarterly payments to the holders of Allowed General Unsecured Claims, and those holders will share *pro rata* in each quarterly distribution. The maximum amount that the Debtor will pay in the aggregate to the holders of Allowed General Unsecured Claims is $3,000,000.00, and the maximum length of time during which such payments shall be made is four years.

The distribution schedule will be as follows:[5] Commencing on the first of the month following the Effective Date, $187,500.00 per quarter for 16 quarters, or such lesser amount of time as is required to pay 11.5% of the total Allowed General Unsecured Claims. Any shortfall or overage shall be applied to the final payment. Debtor may prepay any or all of the distributions described herein with no prepayment penalty, and to the extent that less than $5,000.00 remains payable to any individual creditor to satisfy 11.5% of the Allowed amount of such creditor's claim, the Debtor may satisfy that creditor's claim in full at any time as illustrated below. The *pro rata* distribution to the holders of Allowed General Unsecured Claims shall be in full satisfaction, settlement, release, and discharge of their respective

---

[5] The list of unsecured creditors in Exhibit "A" Plan Financials Section 20 attached to the Disclosure Statement assumes that any pending objections to claims filed by Debtor will be sustained and makes other assumptions regarding the potential resolution of other claims. The final claims numbers may be higher or lower to the extent additional claims objections are sustained or additional claims are added. Nonetheless, the total amount distributed to general unsecured creditors will be 11.5% with a cap of $3,000,000.

Allowed General Unsecured Claims, except for the Main Street Loan claim, the treatment of which is described below.

In addition to the distributions described above of up to 11.5% of Allowed General Unsecured Claims, or a *pro rata* share of up to $3,000,000.00, the holders of Allowed General Unsecured Claims will receive fifty percent of the net benefit resulting from post-confirmation claims' objections, as follows: The Debtor retains all rights and interests in the Claims objection process up until confirmation of the Plan. After confirmation of the Plan, the Committee will become the "Claims Administrator" and will assume control over objections to Claims, and the Debtor will be relieved of all liability for the post-confirmation objections-to-Claims process. If the Committee reduces the Allowed amount of Claims post-confirmation, the net benefit resulting from such reduction equally will be split between the Debtor and the Committee. The net benefit means the total amount that the Debtor would be obligated to pay on account of a Claim were its Allowed amount not reduced by objection of the Committee less the costs and expenses incurred by the Committee in objection to such Claim.

To the extent that the Allowed amount of a claim is disputed, the Debtor will escrow such creditor's *pro rata* share of plan distributions pending final resolution of a claim objection.

To illustrate, assume the entire General Unsecured Claims pool is comprised of four creditors, and the aggregate amount of the claims of those creditors is $26,086,956.50. Eleven and a half percent of $26,086,956.50 is $3,000,000.00;

therefore, if there are no objections to claims, then the Debtor will pay $187,500.00 per quarter for a total of 16 quarters.[6]

Assume one of the three general unsecured creditors ("Creditor Z") filed a claim in the amount of $13,043,478.25 (i.e. 50% of the General Unsecured Claims pool). Assume further that the Committee objects to that claim, and in the sixth quarter, the claim objection is sustained and the allowed amount of the claim becomes $10,000,000.00. This reduces the aggregate amount of the general unsecured claims to $23,043,478.25.

Eleven and a half percent of $23,043,478.25 is $2,650,000.00. The Debtor will have paid $2,650,000.00 by quarter 15. Distributions would occur as follows:

Q1: $187,500.00 paid by the Debtor and distributed as follows: $93,750.00 escrowed for Creditor Z, and $93,750.00 distributed to the remaining three creditors *pro rata*.

Identical distributions would be made for the next five quarters.

Q7: $187,500.00 paid by the Debtor, with distributions occurring as follows: $656,250.00 distributed to Creditor Z ($562,500.00 released from escrow plus *pro rata* share of Q7 distribution), and $93,750.00 distributed to remaining three creditors *pro rata*.

Q8: $187,500.00, distributed *pro rata* to all four creditors.

---

[6] If the aggregate Allowed amount of General Unsecured Claims exceeds $26,086,956.50, then the Debtor will pay $187,500.00 per quarter for a total of 16 quarters, and the general unsecured creditors will receive less than 11.5% of the Allowed amount of their respective claims in full and final satisfaction of their claims against the Debtor.

Identical distributions would be made for the next six quarters. Once the Q14 distribution in the aggregate amount of $187,500.00 is made, the total payments made by the Debtor would amount to $2,625,000.00.

Q15: $25,000.00, distributed *pro rata* to all four creditors.

Final distributions would occur in Q15, with no distribution occurring in Q16.

The Debtor and the Committee would split the $50,000.00 reduction in the Allowed amount of general unsecured claims, and each party's share would be in an amount equal to $25,000.00 less fifty percent of the costs and expenses incurred by the Committee in prosecuting its objection to the claim of Creditor Z.

With regards to claims in low dollar amounts, the following illustration applies. If, of the four hypothetical creditors, the Allowed amount of the general unsecured claim of "Creditor Y" amounts to $16,000.00, then the total distribution payable to Creditor Y would be in the amount of $1,840.00 (i.e. 11.5% of $16,000.00). The Debtor may pay Creditor Y $1,840.00 in Q1 in full and final satisfaction of Creditor Y's claim rather than paying Creditor Y $115.00 per quarter. The hypothetical distribution schedule would be as follows:

Q1: $187,500.00 paid by the Debtor and distributed as follows: $1,840.00 distributed to Creditor Y, $92,830.00 escrowed for Creditor Z, and $92,830.00 distributed to the remaining two creditors *pro rata*.

No further distributions would be made to Creditor Y, whose claim against the Debtor has been satisfied in full through the Q1 distribution.

Q2: $187,500.00 paid by the Debtor and distributed as follows: $93,750.00 escrowed for Creditor Z, and $93,750.00 distributed to the remaining two creditors *pro rata*.

Identical distributions would be made for the next four quarters.

Q7: $187,500.00 paid by the Debtor, with distributions occurring as follows: $655,330.00 distributed to Creditor Z ($561,580.00 released from escrow plus *pro rata* share of Q7 distribution), and $93,750.00 distributed to remaining two creditors *pro rata*.

Q8: $187,500.00, distributed *pro rata* to all three remaining creditors.

Identical distributions would be made for the next six quarters. Once the Q14 distribution in the aggregate amount of $187,500.00 is made, the total payments made by the Debtor would amount to $2,625,000.00.

Q15: $25,000.00, distributed *pro rata* to all three remaining creditors.

Final distributions would occur in Q15, with no distribution occurring in Q16.

Furthermore, and by agreement of the Committee and the Debtor, the Committee will not assert any chapter 5 claims against any party, and consents to the Debtor releasing all such claims. The Debtor also releases all chapter 5 claims as to any party.

In addition, the Committee will not object to this Plan and will support its confirmation.

*Impairment*: This Class is impaired, and holders of Allowed Claims in this Class are entitled to vote to accept or reject the Plan.

38

peer

*Main Street Loan Claim*: CNB filed a general unsecured claim (POC No. 78) against the Debtor in the amount of $9,877,601.41, which amount is Allowed and is payable on a loan that is serviced by CNB (the "Main Street Loan"). CNB will share in the distribution to general unsecured creditors *pro rata*.

If the *pro rata* distribution payable on the Main Street Loan amounts to less than $815,000.00, then RE PR will pay the difference between $815,000.00 and the total distribution, and, as additional New Value, Mr. Krantzberg personally will guarantee RE PR's payment.

As part of his New Value contributions, Mr. Krantzberg will pay approximately $485,000.00 towards the Main Street Loan, as set forth below, and to secure his payment obligations, and as additional New Value, Mr. Krantzberg will grant CNB a security interest in any and all of the website(s) and domain names, and the proceeds and fees generated therefrom, that relate to the Debtor or the Reorganized Debtor and that are owned by Mr. Krantzberg or any of his affiliates.[7] As additional New Value, Mr. Krantzberg will pay $75,000.00 per year in equal monthly installments in 2025 and in 2026. Mr. Krantzberg also, as a further contribution of New Value, will make a balloon payment in the approximate amount of $335,000.00 no later than December 31, 2026 (the "Balloon Payment").

If the *pro rata* distribution payable by the Reorganized Debtor on the Main

---

[7] Mr. Krantzberg's pledge of website(s), domain names, and proceeds and fees therefrom, is not intended to diminish or impair, and shall not be construed as diminishing or impairing, Mr. Krantzberg's provision of New Value to the Reorganized Debtor in the form of a waiver of Mr. Krantzberg's administrative claim for fees payable by the Debtor for the Debtor's use of pledged website(s) or domain name(s).

Street Loan amounts to more than $815,000.00, then the Balloon Payment will be reduced by an amount equal to the difference between the total distribution on the Main Street Loan and $815,000.00 (the "Krantzberg Credit"). However, the Krantzberg Credit will not apply if the distribution on account of the Main Street Loan exceeds $815,000.00 because of recoveries from litigation targets. In other words, if litigation recoveries inflate the total funds payable to general unsecured creditors such that the *pro rata* distribution for the Main Street Loan exceeds $815,000.00, Mr. Krantzberg must make the full $335,000.00 Balloon Payment, which shall also constitute a further New Value contribution.

Additionally, the Debtor's subsidiary, RE PR, and the Debtor's supplier, Invicta, will make payments on the Main Street Loan. RE PR will pay $1,500,000.00 over 3 years, which payment obligation Mr. Krantzberg, as part of his New Value contribution, personally will guarantee. Invicta will pay CNB $250,000.00 over 3 years, in monthly installments of $6,944.45, beginning on the Initial Payment Date and ending no later than December 31, 2026.

The Main Street Loan claim will be satisfied in full, and the Debtor, the Reorganized Debtor, Invicta, Mr. Krantzberg, and RE PR will be forever released and discharged from any and all obligations on the Main Street Loan claim, upon payment in full by RE PR, Invicta, Mr. Krantzberg, and the Reorganized Debtor, according to the terms set forth above. Pending such payment in full, both the Invicta Subordination Agreement and the Newport Subordination Agreement (which is contained within the guarantee which Newport provided to CNB) will remain in full

force and effect. To the extent not covered by the subordination agreements, and for the avoidance of doubt, (i) Newport will not receive any payments under the Plan or from any of the parties contributing to payments on the Main Street Loan until the Main Street Loan is paid in full according to the terms set forth above, and (ii) any payments that may be due to Invicta from the Debtor pursuant to the Plan and on account of Invicta's $30,000,000.00 claim shall be made directly to CNB on account of the Main Street Loan until the Main Street Loan is paid in full.

**Class 16 – Allowed Equity Interests**:

(a)    <u>Description</u>: Class 16 consists of the Allowed Equity Interests in the Debtor. Mr. Krantzberg is the Debtor's manager, president, and 100% interest holder.

(b)    <u>Treatment</u>: Mr. Krantzberg will retain his 100% equity interest in the Debtor/Reorganized Debtor by contributing "New Value" in the approximate amount of $5,055,161.67, in the form of (a) a waiver of Mr. Krantzberg's general unsecured claim of $786,661.67 against the estate; (b) a waiver of Mr. Krantzberg's administrative claim in the approximate amount of $714,000.00[8] against the estate; (c) a waiver of $239,500.00 which is owed by the Debtor to Mr. Krantzberg's wholly-owned company, 405 Southwest Real Estate Company, LLC[9]; (d) $2,500,000.00 as a capital infusion made by Mr. Krantzberg to the Reorganized Debtor, payable in 16 quarterly payments commencing on the Initial Payment Date and according to the

---

[8] Mr. Krantzberg is entitled to a monthly $95,500 licensing fee for the use of his website by the Debtor, pursuant to the RE Licensing Agreement as described in the Disclosure Statement. Such amount has not been paid during the pendency of this case, and is accruing monthly.

[9] This amount would otherwise need to be paid in full as the Debtor is assuming this lease.

schedule in **Exhibit "A" Plan Financials Section 12**, attached to the Disclosure Statement, and (e) Mr. Krantzberg's contributions to the Main Street Loan in the amount of $485,000 plus a backstop to Main Street's general unsecured distribution in the amount of $815,000. Further, Mr. Krantzberg is providing new personal guarantees covering over $4,500,000 in commercial lease and Main Street loan commitments[10].

(c)    <u>Impairment</u>: Class 16 is impaired, and the holder of the Allowed Equity Interest is entitled to vote to accept or reject the Plan.

### ARTICLE IV
### <u>IMPAIRMENT</u>

Claimants and Equity Interest holders entitled to vote under the Plan must affirmatively act in order for the Plan to be confirmed by the Court. According to the Plan, all 16 Classes are "Impaired" classes within the meaning of Section 1124 of the Bankruptcy Code. These classes, accordingly, must vote to accept the Plan in order for the Plan to be confirmed without a "cram down". A claimant who fails to vote to either accept or reject the Plan will not be included in the calculation regarding acceptance or rejection of the Plan.

A ballot to be completed by the holders of claims and/or interests is included herewith. Instructions for completing and returning the ballots are set forth thereon and should be reviewed at length. The Plan will be confirmed by the Court and made

---

[10] The value of these personal guarantees is critical to the consummation of this plan and a successful reorganization of this Debtor. The numerical value of these guarantees has not been included in the New Value calculation above; notwithstanding, such commitments are vital to the reorganization process.

binding upon all claimants and interest holders if (a) with respect to impaired classes of claimants, the Plan is accepted by holders of at least two-thirds in amount and more than one-half in number of claims in each such class voting upon the Plan and (b) with respect to classes of interest holders, if the Plan is accepted by the holders of at least two-thirds in amount of the allowed interests of such class held by holders of such interests. In the event the requisite acceptances are not obtained, the Court may, nevertheless, confirm the Plan if it finds pursuant to Section 1129 of the Bankruptcy Code that the Plan does not discriminate unfairly and accords fair and equitable treatment to any impaired class that does not accept the Plan.

## ARTICLE V
### MEANS OF EXECUTION

5.1 All payments as provided for in the Plan will be funded from the Debtor's Cash on hand, future net revenue from the continued operation of the Debtor's business, and Mr. Krantzberg's New Value contributions, unless otherwise stated.

5.2 Upon the entry of the Confirmation Order, subject to the occurrence of the Effective Date, the Reorganized Debtor will be vested with all of its property free and clear of all claims and interests of creditors, except as otherwise provided for herein.

5.3 After the entry of an Order of Confirmation, subject to the occurrence of the Effective Date, the Reorganized Debtor will continue the Debtor's business and manage the Debtor's affairs without further supervision of the Court.

5.4 Mauricio Krantzberg is named as the disbursing agent responsible for making the payments under the Plan (the "Disbursing Agent"). The payments will be made as provided in Article III.

5.5 <u>Unclaimed Funds</u>. If the holder of an Allowed Claim ("<u>Holder</u>") fails to negotiate a check for a Distribution issued to such Holder within 60 days of the date such check was issued, then the Reorganized Debtor will provide written notice to such Holder stating that, unless such Holder negotiates such check within 90 days of the date of such notice, the amount of Cash attributable to such check will be deemed to be unclaimed, such Holder will be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim will no longer be deemed to be Allowed, and such Holder will not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to the Reorganized Debtor due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to the Reorganized Debtor as to such check within 90 days of the date such Distribution was made, then the amount of Cash attributable to such check will be deemed to be unclaimed, such Holder will be deemed to have no further Claim with respect to such check, such Holder's Allowed Claim will no longer be deemed to be Allowed, and such Holder will not be entitled to participate in any further Distributions under the Plan in respect of such Claim. Any unclaimed Distribution as described above will constitute "Unclaimed Funds" and will first be distributed *pro rata* to the holders of Allowed Administrative Claims. To the extent the holders of Allowed Administrative Claims have been paid in full, any remaining Unclaimed Funds will be distributed *pro rata* to holders of Allowed General Unsecured Claims

under Class 15.

## ARTICLE VI
### EXECUTORY CONTRACTS

Pursuant to Sections 365(a) and 1123(b)(2) of the Code, all executory contracts and unexpired leases that currently exist between Debtor and the other party that are listed below shall be rejected or assumed, as the case may be and as delineated below, as of the Effective Date; provided, however, that Debtor reserves the right, on or prior to the Confirmation Date, to amend the below list to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, or change intended treatment from assumption to rejection, or vice versa, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be assumed or rejected, as the case may be. Any and all executory contracts and unexpired leases of Debtor not expressly assumed herein or assumed prior to the Confirmation Date, or are not as of the Confirmation Date the subject of a pending application to assume, shall be deemed to be rejected.

**Leases Rejected Prior to Petition Date. _See_ Court Order ECF No. 150**

| Date of Lease | Premises | Landlord/Notice Address |
|---|---|---|
| 11/15/2011 | Town Center Mall in Boca Raton | The Town Center at Boca Raton Trust c/o M.S. Management Associates Inc., 225 West Washington Street, Indianapolis, IN 46204-3438 |

**Leases Rejected as of Petition Date. _See_ Court Order ECF No. 150**

| Date of Lease | Premises | Landlord/Notice Address |
|---|---|---|

| 11/15/2011 | Miami International Mall | Mall at Miami International, LLC c/o M.S. Management Associates Inc., 225 West Washington Street, Indianapolis, IN 46204-3438 |

## Leases Rejected as of June 30, 2023. *See* Court Order ECF No. 151

| Date of Lease | Premises | Monthly Rent – Total charges not including variable rent | Landlord/Notice Address |
| --- | --- | --- | --- |
| 1/8/2020 | Florida Mall, Room 212 Orlando, FL | $26,054.00 | Simon Property Group, L.P. Florida Mall Associates, Ltd. c/o M.S. Management Associates Inc. 225 West Washington Street, Indianapolis, IN 46204-3438 |
| 10/4/2018 | Las Vegas South Premium Outlets Unit K138, Las Vegas, Nevada | $14,692.00 | Las Vegas South Outlets, LLC c/o Simon Property Group,L.P.225 West Washington Street, Indianapolis, IN 46204-3438 |
| 6/6/2019 | Las Vegas North Premium Outlets Unit 1504, Las Vegas, NE | $28,473.00 | Las Vegas North Outlets, LLC c/o Simon Property Group,L.P.225 West Washington Street, Indianapolis, IN 46204-3438Attn:Premium Outlets |
| 5/13/2023 | Lenox Square, Room 2032B, Atlanta, GA | $15,528.00 | Simon Property Group, L.P. The Retail Property Trust c/o M.S. Management Associates Inc. 225 West Washington Street, Indianapolis, IN 46204-3438 |
| 10/25/2018 | The Mills at Jersey Gardens Kiosk No. K109, Elizabeth, NJ | $13,028.00 | Simon Property Group, L.P. JG Elizabeth II, LLC c/o M.S. Management Associates, Inc. 225 West Washington Street, Indianapolis, IN 46204-3438 |
| 4/30/2018 | San Marcos Premium Outlets Unit 1180, San Marcos, TX | $15,418.00 | San Marcos Premium Outlets, L.P. c/o Simon Property Group,L.P.225 West Washington Street, Indianapolis, IN 46204-3438 |

## Leases being Rejected Pursuant to the Plan

| Vacate date | Premises | Total landlord charges | Landlord/Notice Address |
| --- | --- | --- | --- |

| | | (monthly occupancy costs) | |
|---|---|---|---|
| 8/20/2023 | International Plaza, Tampa, FL | $11,964 | Tampa Westshore Associates L.P., 200 E. Long Lake Road, P.O. Box 200, Bloomfield Hills, MI 48303-0200 |
| Effective Date | Westland Mall – Kiosk | $7,959.00 | Westland Mall, LLC, 591 West Putnam Ave., Greenwich, CT 06830 |
| 1/5/2024 | Orlando – Vineland Premium Outlets | $33,182.00 | Orlando Vineland PO, L.P., P.O. Box 827733, Philadelphia, PA 19182-7733 |
| 1/5/2024 | Times Square | $104,607.00 | 1535 Broadway LLC, c/o Vornado Office Management LLC, 888 Seventh Ave, New York, NY 10019 |
| 1/5/2024 | Aventura Mall | $22,509.00 | Aventura Mall Venture, c/o Turnberry Aventura Mall Company, Ltd., 19501 Biscayne Boulevard, Suite 400, Aventura, FL 33180 |

## Leases being Assumed Pursuant to the Plan

| Premises | Landlord/Notice Address |
|---|---|
| University Mall - Sarasota | Taubman Benderson UTC LLC, 200 E. Long Lake Road, P.O. Box 200, Bloomfield Hills, MI 48303 |
| Sawgrass | Sunrise Mills (MLP) Limited Partnership, c/o M.S. Management Associates Inc., 225 W. Washington Street, Indianapolis, IN 46204-3438 |
| Orlando – Intl. Prem. Outlets | Orlando Outlet Owner, LLC, PO Box 772811, Chicago, IL 60677-2811 |
| Tanger - Daytona | Tanger Daytona, LLC, c/o Tanger Management, LLC, 3200 Northline Avenue, Suite 360, Greensboro, NC 27408 |
| Tanger - Glendale | Outlets at Westgate, LLC, c/o Tanger Management, LLC, 3200 Northline Avenue, Suite 360, Greensboro, NC 27408 |
| Tanger – Palm Beach | Palm Beach Outlets I, LLC, C/o Clarion Partners, 230 Park Avenue, New York, NY 10169, Attn: Sean O'Connor |
| El Paso | El Paso Outlet Center CMBS, LLC, c/o Horizon Group Properties Inc., 131 West Seaway Drive, Suite 220, Muskegon, MI 49444 |
| Christiana - Brookfield | Christiana Mall LLC, c/o Christiana Mall, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department |

| | |
|---|---|
| North Star Mall - Brookfield | North Star Mall, LLC, c/o North Star Mall, 350 N. Orleans St., Suite 300, Chicago, IL 60654-1607, Attn: Law/Lease Administration Department |
| Perimeter - Brookfield | Perimeter Mall, LLC, c/o Perimeter Mall, 350 N. Orleans St., Suite 300, Chicago, IL 60654-1607, Attn: Law/Lease Administration Department |
| Elmhurst (Queens Center) - Macerich | Queens Center SPE LLC, 90-15 Queens Boulevard, Elmhurst, NY 11373-4900, Attention: Center Manager |
| Westfield - Brandon | Brandon (Tampa) LP, c/o CentreCorp Management Services LLLP 459 Brandon Town Center, Dr., Brandon, FL 33511 Attn: Katie Woolridge |
| Westland Mall | Westland Mall, LLC, 591 West Putnam Ave, Greenwich, CT 06830 |
| Prince George's | PR Prince George's Plaza LLC, c/o PREIT Services, LLC, 200 South Broad Street, The Bellevue, Third Floor, Philadelphia, PA 19102, Attn: Director, Legal |
| Cross County (Brooks – Yonkers, NY) | Marx Realty and Improvement Company, Inc., 708 Third Avenue, 15th Floor, New York, NY 10017-4146, Attention: Jag Shah |
| 405 Southwest | 405 Southwest Real Estate Company, LLC, 405 SW 148 Ave Suite #1, Davie, FL 33325 |

## Contracts Being Assumed Pursuant to the Plan

| Counterparty | Type | Original start date and term | Cure treatment |
|---|---|---|---|
| AFCO Credit Corp. | Insurance premium finance agreement | 2/28/23 11 mos. | n/a |
| Affirm, Inc. | Installment and split pay services | 3/22/23 1 yr. | $13,166.67/mo. for 6 mos. commencing 1st of the month following Effective Date |
| Dell Financial Services, L.L.C. | Computer equipment and software | 10/5/22 3 yrs. | n/a |
| Extend, Inc. | Extended warranties | 5/11/22 3 yrs. | $20,000/mo. for 6 mos. commencing 1st of the month following Effective Date |
| Invicta Watch Company of America, Inc. | Royalty agreement | 5/21/21 | n/a |

| Invicta Watch Company of America, Inc. | Distribution agreement | 5/14/19 | n/a |
|---|---|---|---|
| Mauricio Krantzberg | Licensing agreement | 11/1/2015 – 12/31/30 | n/a |
| Salesforce, Inc. | Marketing | 7/22/22-11/28/23 | $20,356.40/mo. for 6 mos. commencing 1st of the month following Effective Date |

Unless otherwise ordered by the Bankruptcy Court, any Claims for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the date that is **ten (10) days after the Confirmation Date** or such Claim shall be forever barred and unenforceable against Debtor, Reorganized Debtor, or the assets of any of them. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to persons who may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the deadline for filing a Claim for rejection damages in connection therewith.

<div align="center">

**ARTICLE VII**
**CLAIMANTS AND IMPAIRED INTEREST HOLDERS**

</div>

Claimants and Equity Interest holders entitled to vote under the Plan must affirmatively act in order for the Plan to be confirmed by the Court. According to the Plan, all 15 Classes are "Impaired" classes within the meaning of Section 1124 of the Bankruptcy Code. These classes, accordingly, must vote to accept the Plan in order for the Plan to be confirmed without a "cram down". A claimant who fails to vote to either accept or reject the Plan will not be included in the calculation regarding

DocuSign Envelope ID: BB7D2F16-E785-4726-AB16-2898C86EB43C

acceptance or rejection of the Plan.

A ballot to be completed by the holders of claims and/or interests is included herewith. Instructions for completing and returning the ballots are set forth thereon and should be reviewed at length. The Plan will be confirmed by the Court and made binding upon all claimants and interest holders if (a) with respect to impaired classes of claimants, the Plan is accepted by holders of at least two-thirds in amount and more than one-half in number of claims in each such class voting upon the Plan and (b) with respect to classes of interest holders, if the Plan is accepted by the holders of at least two-thirds in amount of the allowed interests of such class held by holders of such interests. In the event the requisite acceptances are not obtained, the Court may, nevertheless, confirm the Plan if it finds pursuant to Section 1129 of the Bankruptcy Code that the Plan does not discriminate unfairly and accords fair and equitable treatment to any impaired class that does not accept the Plan.

## ARTICLE VIII
### CRAM DOWN AND MODIFICATION

### Utilization of "Cram Down"

If all of the applicable provisions of 11 U.S.C. §1129(a) other than paragraph (8) are found to have been met with respect to the Plan, the Debtor may seek confirmation pursuant to 11 U.S.C. §1129(b). For the purposes of seeking confirmation under the "cram down" provisions of the Bankruptcy Code, should that alternative means of confirmation prove to be necessary, the Debtor reserves the right to modify or vary the treatment of the claims of the rejecting Classes so as to comply with Section 1129(b) of the Bankruptcy Code.

The Plan may be confirmed by "cram down" if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each dissenting class.

The Plan is deemed "fair and equitable" if it provides (i) that each holder of a secured claim retains its lien and receives deferred Cash payments totaling at least the Allowed amount of its Claim, of a value, as of the effective date of the Plan, of at least the value of its secured interest in the property subject to the lien, and (ii) that each holder of an unsecured Claim receives property of a value equal to the Allowed amount of its Claim, or no holder of a junior Claim receives or retains any property on account of such Claim.

<u>Modification of Plan</u>

At any time before the Confirmation Date, Debtor may modify the Plan, but may not modify the Plan so that the Plan, as modified, fails to meet the requirements of Sections 1122 and 1123 of the Bankruptcy Code. After Debtor files a modification with the Court, the Plan, as modified, shall become an amended Plan.

At any time after the Confirmation Date, and before substantial consummation of the Plan, Debtor may modify the Plan with permission of the Court so that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code. The Plan, as modified under this paragraph, shall become an amended Plan.

After the Confirmation Date, Debtor may, with approval of the Court, and so long as it does not materially and adversely affect the interest of creditors, remedy

any defect or omission, or reconcile any inconsistencies in the Plan or in the Order of Confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan.

## ARTICLE IX
### DUTIES AND FEES OWED TO THE OFFICE OF THE U.S. TRUSTEE

With respect to pre-confirmation periods, Debtor is required to pay the appropriate sums required pursuant to Section 1930(a)(6) within ten days of the entry of the order confirming the Plan. Debtor must also file all monthly operating reports for the relevant periods indicating the Cash disbursements for the relevant period.

With respect to post-confirmation periods, Reorganized Debtor will pay the United States Trustee fee for post-confirmation periods based upon all post-confirmation disbursements made by Reorganized Debtor. Reorganized Debtor will also file all post-confirmation quarterly operating reports with the Court until the earlier of the closing of the case or upon dismissal or conversion of the case.

## ARTICLE X
### EFFECT OF CONFIRMATION

Binding Effect. The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims and Equity Interests, and their respective successors and assigns.

Injunction. All entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor are, with respect to any such Claims or Equity Interests, and after the Confirmation Date, permanently enjoined from taking any of the following actions (other than actions to enforce any rights or obligations under

DocuSign Envelope ID: BB7D2F16-E785-4726-AB16-28D8C86EB43C

the Plan): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting Debtor/Reorganized Debtor or any of its property; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any encumbrance of any kind against Debtor/Reorganized Debtor; (iii) asserting any right of setoff, directly or indirectly, against any obligation due Debtor/Reorganized Debtor, or any of their property, except as contemplated or allowed by the Plan; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (v) prosecuting or otherwise asserting any right, claim or cause of action against Debtor/Reorganized Debtor, that has been exculpated pursuant to the Plan; provided, however, that the injunction provided herein above shall neither bar any entity from asserting any defense in an action commenced by or on behalf of any of Debtor/Reorganized Debtor, nor prohibit any entity from asserting any right expressly preserved or contemplated by the Plan.

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Equity Interest shall be deemed to have specifically consented to the Injunctions set forth herein.

Moreover, so long as the Debtor, Mr. Krantzberg, RE PR, and Invicta are current on their payment obligations on CNB's Revolving Note and on the Main Street Loan, CNB covenants not to sue or assert any claims, including avoidance

claims under Chapter 5 of the Bankruptcy Code, against Mr. Krantzberg, Island Cabo, Newport Venture Limited, 405 Southwest Real Estate Company, LLC, or RE PR.

Default by the Debtor. Any default by the Debtor on its payment obligations for the CNB secured debt or for the Main Street Loan, or any default by RE PR or by Invicta on their respective payment obligations for the Main Street Loan, shall constitute a cross-default of all obligations to CNB and to MS Facilities, LLC under the Plan for all purposes.

Discharge of the Debtor. On the Effective Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt (i) imposed by this Plan; or (ii) to the extent provided in § 1141(d)(6).

Releases. On the confirmation date of this Plan, without the need for execution or delivery of any additional documentation or orders of the Bankruptcy Court, and in exchange for valuable consideration of his contribution of New Value, as described in the treatment of Class 15 of this Plan, Mauricio Krantzberg and his affiliated entities Island Cabo S.A., Newport Ventures Ltd., 405 Southwest Real Estate Company, LLC, 205, Watch Brand, and RE PR (collectively, the "Released Party") will be fully and finally released and forever discharged from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies, and demands, of every kind and nature whatsoever,

in law or in equity, relating to the obligations of Debtor to any other person or entity, including but not limited to (i) any explicit or implicit guarantees of the Released Party for the obligations of Debtor, unless such guarantees are specifically provided for in this Plan, (ii) pre-petition claims, interests, or rights which were, or could have been asserted, against the Debtor, and (iii) post-petition claims that could have been asserted against Debtor prior to the confirmation of this Plan (collectively, "Released Claims"), except as set forth below.

Upon full performance of payment obligations on CNB's Revolving Note and on the Main Street Loan, CNB shall be deemed to have released Mr. Krantzberg, Island Cabo, Newport Venture Limited, 405 Southwest Real Estate Company, LLC, and RE PR from all claims and obligations relating to the Revolving Note and to the Main Street Loan (the "CNB Release"), except for the mortgage loan described hereafter, which mortgage loan expressly is carved out of the settlement agreement.

CNB and 405 Southwest Real Estate Company, LLC ("405") entered into a loan agreement dated February 13, 2020, in the original principal amount of $5,000,000.00, which loan is secured by a mortgage and by a pledge agreement and guarantees of, among others, Mr. Krantzberg, the Debtor, and RE PR (the "405 Mortgage Loan"). The CNB Release does not apply to the 405 Mortgage Loan.

Additionally, CNB and Invicta will exchange mutual releases as to claims related to the Debtor upon payment in full of CNB's Revolving Note and the Main Street Loan. For the avoidance of doubt, CNB will not release any claims against Invicta related to any matter unrelated to the Debtor, such as existing loans that

55

CNB has with Invicta.

Exculpation. Except as specifically provided in the Plan, neither the Debtor, nor its employees, representatives, members, advisors, attorneys, accountants, financial advisors, or agents, or any of such parties' successors or assigns, shall have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, agents, or affiliates, or any of their successors or assigns, for (i) any prepetition act taken or omitted to be taken in connection with, related to or arising from authorizing, preparing for, or filing the Chapter 11 Case, (ii) any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, (iii) the negotiation and pursuit of confirmation of this Plan, (iv) the consummation of this Plan, (v) the administration of this Plan, or (vi) the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or actual fraud, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under this Plan.

The Committee, its representatives, members, advisors, attorneys, accountants, financial advisors, and agents, or any of such parties' successors or assigns, shall neither have nor incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors,

shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, agents, or affiliates, or any of their successors or assigns, for (i) any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, (ii) the negotiation and pursuit of confirmation of this Plan, (iii) the consummation of this Plan, (iv) the administration of this Plan, or (vi) the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or actual fraud, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under this Plan.

Final Decree as to Debtor and Closing of the Case. Upon substantial consummation of the Plan, the Debtor, or such other party as the Court shall designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## ARTICLE XI
### POST-CONFIRMATION REORGANIZED DEBTOR'S STRUCTURE

Equity Structure. Upon the Effective Date, the Reorganized Debtor shall continue to exist, with all assets re-vesting in the Reorganized Debtor and with all powers of limited liability companies under the laws of the State of Florida and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under Florida law. Following the Effective Date, the Reorganized Debtor shall be free to operate and perform any and all acts authorized by its Operating Agreement without further order from the Court, subject only to the terms of the Plan and Confirmation Order. Upon the Effective Date, Debtors'

DocuSign Envelope ID: BB7D2F16-E785-4726-AB16-28D9C88EB43C

management shall remain unchanged, in that Mauricio Krantzberg shall remain the sole manager and 100% interest holder of Debtor and shall continue to act as president of the Debtor/Reorganized Debtor.

Post-Confirmation Structure: Upon the entry of the Confirmation Order, subject to the occurrence of the Effective Date, the property of the Debtor shall be free and clear of all claims and interests of creditors, except as otherwise provided for herein. On or as of the Effective Date, the Plan shall be implemented and the Debtor shall carry out all the obligations and responsibilities required under the Plan, including the execution and delivery of all documentation contemplated by the Plan. The Debtor shall continue to exist after the Effective Date as a separate entity with all assets re-vesting in the Debtor and with all powers of corporations under the laws of the State of Florida and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution, or otherwise) under Florida law.

All matters provided for under the Plan involving the corporate structure of the Debtor, Reorganized Debtor, or any corporate action to be taken by or required of the Debtor or Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the Debtor or Reorganized Debtor.

Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the officers, partners, directors, members and managers, as the case may be, of the Debtor immediately

prior to the Effective Date shall be deemed to be the officers, partners, directors, members, and managers of the Reorganized Debtor without any further action by any party.

As of the Effective Date, the Debtor may use, acquire, and dispose of its assets, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order. All privileges with respect to the assets of the Debtor's estate, including the attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Debtor or the Reorganized Debtor, as the case may be.

## ARTICLE XII
### RETENTION OF JURISDICTION

11.1 From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the reorganization case for the following purposes:

(a) to hear and determine any and all objections to the allowance of any Claim or any controversy as to the classification of Claims;

(b) to hear and determine any and all applications for compensation and reimbursement of expenses to professionals as well as to hear and determine claims entitled to priority under Section 507(a)(1) of the Bankruptcy Code;

(c) to enable Debtor to prosecute any and all proceedings which may be brought to set aside liens or encumbrances and to recover any transfers, assets, properties, or damages to which Debtor may be entitled under applicable provisions

of the Bankruptcy Code or any other Federal, State or local laws; including causes of action, controversies, disputes, and conflicts between Debtor and any other party, including but not limited to any causes of action for objections to claims, preferences or fraudulent transfers and obligations or equitable subordination; and to enter any order assuring that good, sufficient and marketable legal title is conveyed to the purchaser of Debtor's property;

(d) to consider any necessary valuation issues under Section 506 of the Bankruptcy Code, and any proceeding to determine the amount, validity, and priority of liens, in connection with Debtor's property;

(e) to determine the rights of any party in respect of the assumption or rejection of any executory contracts or unexpired leases;

(f) to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and intent of this Plan;

(g) to modify this Plan after the Confirmation Date, pursuant to the Bankruptcy Code;

(h) to enforce and interpret the terms and conditions of this Plan;

(i) to enter orders to enforce the title, rights, and power of the Estate as the Court may deem necessary; and

(j) to enter orders concluding and closing this case.

### ARTICLE XIII
### MISCELLANEOUS

DocuSign Envelope ID: BB7D2F16-E785-4726-AB16-28D9C86EB43C

12.1 <u>Allowed and Disallowed Claims</u>. Notwithstanding any other provisions of the Plan, any Claim that is scheduled as disputed, contingent, or unliquidated or which is objected to in whole or in part on or before the date for distribution, shall not be paid in accordance with the provisions of the Plan until such Claim has become an Allowed Claim by a final order. If Allowed, the Claim shall be paid on the same terms as if there had been no dispute.

12.2 <u>Headings</u>. Headings are utilized in this Plan for the convenience of reference only, and shall not constitute a part of this Plan for any other purpose.

12.3 <u>Defects, Omissions and Amendments</u>. This Plan may be altered, amended or modified by Debtor before or after the Confirmation Date as provided in Section 1127 of the Bankruptcy Code and as set forth in Article X herein and Article X of the Disclosure Statement.

12.4 <u>Governing Law</u>. Except to the extent that the Bankruptcy Code is applicable, all rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida.

12.5 <u>Severability</u>. Should any provision in this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of this Plan.

12.6 <u>Regulatory Approval</u>. No regulatory approval is necessary for the confirmation of this Plan.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

This Amended Plan is respectfully submitted:    12/4/2023

Retailing Enterprises, LLC

MAURICIO KRANTZBERG, PRESIDENT

Wernick Law, PLLC
*Counsel for the Debtor*
2255 Glades Road, Suite 324A
Boca Raton, FL 33431
561-961-0922

By: /s/ *Aaron A. Wernick*
    Aaron A. Wernick, Esq.
    Florida Bar No. 14059
    aw@wernicklaw.com