

**ORDERED in the Southern District of Florida on February 21, 2024.**

_____
**Scott M. Grossman, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

Retailing Enterprises, LLC,

          Debtor.

Case No. 23-14169-SMG
Chapter 11

_____/

### ORDER CONFIRMING DEBTOR'S AMENDED PLAN OF REORGANIZATION AND APPROVING DEBTOR'S AMENDED DISCLOSURE STATEMENT

This matter came before the Court on February 12, 2024 at 9:30 a.m. (the "Hearing") to consider confirmation of the *Debtor's Amended Plan of Reorganization* [ECF 446] and *Supplement to Debtor's Amended Plan of Reorganization* [ECF 506] (collectively, the "Plan") filed on December 4, 2023 and January 12, 2024 respectively, by the Debtor, Retailing Enterprises, LLC (the "Debtor" or "Plan Proponent" or

"Reorganized Debtor"). At the Hearing, the Court also considered the final approval of the *Debtor's Amended Disclosure Statement* (the "Disclosure Statement") [ECF 447], filed on December 4, 2023.

In connection with confirmation of the Plan, the Court has considered the evidence presented as well as the record of this case, including (i) the Declaration and Proffer of Evidence of Mauricio Krantzberg ("Mr. Krantzberg"), principal of the Debtor, in support of Confirmation of the Debtor's Plan [ECF 571]; (ii) the Amended Certificate on Acceptance of Plan and Tabulation of Ballots [ECF 597] (the "Certificate"); (iii) the representations and arguments made on the record at the Hearing by Debtor's counsel, the attorney for the United States Trustee, counsel to City National Bank of Florida, and counsel to TB Mall at University Town Center, LLC; (iv) the proposed limited modifications to the Plan in resolution of the *Limited Objection to and Reservation of Rights in connection with Confirmation of Amended Plan* [ECF 554] (the "CNB Objection") filed by City National Bank of Florida ("CNB"); and (v) the limited modifications to the Plan in resolution of *TB Mall at University Town Center, LLC's Limited Objection to Confirmation of Debtor's Amended Plan of Reorganization* [ECF 556] (the "UTC Objection") filed by TB Mall at University Town Center, LLC ("UTC").

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A.    **Jurisdiction**. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, the United States District Court's general order of reference,

and other various applicable provisions of the Bankruptcy Code[1] and the Federal Rules of Bankruptcy Procedure ("FRBP").

B.   **Venue**. Venue before the Court is proper under 28 U.S.C. §§ 1408 and 1409.

C.   **Notice**. Due, adequate, and sufficient notice of the Plan [ECF 446 and 506] and the *Order (I) Granting Motion to Conditionally Approve Disclosure Statement and Consolidate Hearings; (II) Conditionally Approving Amended Disclosure Statement; (III) Setting Hearing on Final Approval of Amended Disclosure Statement and Confirmation of Amended Plan; (IV) Setting Hearing on Fee Applications; (V) Setting Various Deadlines; and (VI) Describing Plan Proponent's Obligations* (the "Order Setting Hearings") [ECF 469], were served upon all creditors, interest holders, and parties requesting notice. Accordingly, the method of service and solicitation of acceptance of the Plan, notice of the hearing to consider confirmation of the Plan, and notices of all other deadlines or requirements relating thereto (collectively, the "Confirmation Deadlines") were compliant with the FRBP, were adequate and reasonable under the circumstances of this case, and no further or additional notice of the confirmation hearing or the confirmation deadlines, or re-solicitation of ballots was necessary or required.

D.   **Objections to Confirmation and Limited Modifications to the Plan to Resolve CNB Objection and UTC Objection.** Present at the hearing were the Debtor, counsel for the Debtor, financial advisor for the Debtor, the U.S. Trustee,

---

[1] The term "Bankruptcy Code" refers to the applicable section(s) of 11 U.S.C. § 101, et. seq. unless otherwise indicated.

3

counsel for CNB, counsel for UTC, counsel for Simon Property Group, Inc., counsel for Mauricio Krantzberg, counsel for Aventura Mall Venture, counsel for Invicta Watch Company of America, Inc., financial advisors for the Unsecured Creditors' Committee, counsel for the Unsecured Creditors' Committee, counsel for Brookfield Properties Retail Inc., counsel for 1535 Broadway, LLC, counsel for MS Facilities LLC, and counsel for Westland Mall LLC. Other than the CNB Objection and the UTC Objection, no written objections to the Disclosure Statement or Plan were filed, nor were any objections raised at the Confirmation Hearing. The CNB Objection and the UTC Objection are resolved by certain limited amendments to the Plan contained herein amending and/or clarifying certain terms of the Plan as they relate to CNB and to UTC and the treatment of each creditor's respective claim or agreement with the Debtor, which limited amendments the Court determines to be reasonable. The Plan is hereby modified to incorporate the limited amendments contained herein resolving the CNB Objection and the UTC Objection, and any and all references to the Plan herein shall mean the Plan as amended thereby.

E.    **Proper Classification of Claims – 11 U.S.C. §§ 1122 and 1123**. The Plan adequately and properly identifies and classifies all claims. Pursuant to 11 U.S.C. § 1122(a), the claims placed in each class are substantially similar to other claims in each such class. Pursuant to 11 U.S.C. § 1123(a)(1), valid legal and business reasons exist for the various classes of claims created under the Plan and such classification does not unfairly discriminate among holders of claims. The classification of claims in the Plan is reasonable. Specifically, the Plan provided for

4

the following 16 classes of claims: (1) Allowed Secured Claim of CNB – Revolving Note; (2) Allowed Secured Claim of CNB – 2021 Note; (3) Allowed Secured Claim of CNB of Florida – 2023 Note; (4) Allowed Secured Tax Claim of Bexar County Tax Collector ("Bexar"); (5) Allowed Secured Tax Claims of Prince George's County, Maryland ("PGC"); (6) Allowed Secured Tax Claim of Dekalb County Tax Commissioner ("Dekalb"); (7) Allowed Secured Tax Claim of County of Hays, Texas ("Hays"); (8) Allowed Secured Tax Claim of Hillsborough County Tax Collector ("Hillsborough"); (9) Allowed Secured Tax Claim of San Marcos CISD ("SM CISD"); (10) Allowed Secured Tax Claims of Broward County Tax Collector ("Broward"); (11) Allowed Secured Claim of Ally Bank ("Ally"); (12) Allowed Secured Claim of Dell Financial Services ("Dell"); (13) Allowed Claim of Invicta Watch Company of America, Inc. ("Invicta"); (14A) Allowed Claim of University Town Center for Assumed Lease ("UTC"); (14B) Allowed Claims of Simon Property Group Inc. ("Simon") for various leases including the Assumed Leases; (14C) Allowed Claim of Palm Beach Outlets I, LLC ("PB Outlets") for Assumed Lease; (14D) Allowed Claim of El Paso Outlet Center CMBS, LLC ("El Paso Outlet") for Assumed Lease; (14E) Allowed Claims of Brookfield Properties Retail Inc. ("Brookfield") for Assumed Leases; (14F) Allowed Claim of Queens Center SPE LLC ("Queens") landlord for Assumed Lease; (14G) Allowed Claim of PR Prince George's Plaza LLC ("PR Prince George") for Assumed Lease; (14H) Allowed Claim of Brooks Shopping Centers LLC ("Brooks") for Assumed Lease; (14I) Allowed Claim of Extend, Inc. ("Extend") for Assumed Contract; (14J) Allowed Claim of Affirm Inc. ("Affirm") for Assumed Contract; (14K) Allowed Claim

of Salesforce for Assumed Contract ("Salesforce"); (15) Allowed General Unsecured Claims; and (16) Allowed Equity Interests.

      F.    **Specified Unimpaired Classes – 11 U.S.C. § 1123(a)(2)**. Class 11 (whose claimholder elected to proceed under 11 U.S.C. § 1111(b)) and Classes 12 and 14A-14K (which contain lease and executory contract cures) are all unimpaired under the Plan.

      G.    **Specified Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)**. The Plan specifies the treatment of all classes of claims or interests that are impaired under the Plan. Classes 1-10, 13, 15, and 16 are impaired, and thus are entitled to vote to accept or reject the Plan.

      H.    **No Discrimination – 11 U.S.C. § 1123(a)(4)**. The Plan provides for the same treatment of claims or interests in each respective class by the Debtor unless the holder of a particular claim or interest has agreed to a less favorable treatment of such claim or interest.

      I.    **Implementation of the Plan – 11 U.S.C. § 1123(a)(5)**. Article V of the Plan provides adequate means for the Plan's execution and implementation.

      J.    **Assumption & Rejection – 11 U.S.C. § 1123(b)(2)**. Article VI of the Plan, pursuant to § 365 of the Bankruptcy Code, provides for the assumption, rejection, or assignment of any executory contract or unexpired lease of the Debtor not previously rejected under such section as follows:

      1.   Lease Rejected Prior to Petition Date. *See* Court Order ECF No. 150.

| Date of Lease | Premises | Landlord/Notice Address |
| --- | --- | --- |

| 11/15/2011 | Town Center Mall in Boca Raton | The Town Center at Boca Raton Trust c/o M.S. Management Associates Inc., 225 West Washington Street, Indianapolis, IN 46204-3438 |

2.  Lease Rejected as of Petition Date. *See* Court Order ECF No. 150.

| Date of Lease | Premises | Landlord/Notice Address |
|---|---|---|
| 11/15/2011 | Miami International Mall | Mall at Miami International, LLC c/o M.S. Management Associates Inc., 225 West Washington Street, Indianapolis, IN 46204-3438 |

3.  Leases Rejected as of June 30, 2023. *See* Court Order ECF No. 151.

| Date of Lease | Premises | Monthly Rent – Total charges not including variable rent | Landlord/Notice Address |
|---|---|---|---|
| 1/8/2020 | Florida Mall, Room 212 Orlando, FL | $26,054.00 | Simon Property Group, L.P. Florida Mall Associates, Ltd. c/o M.S. Management Associates Inc. 225 West Washington Street, Indianapolis, IN 46204-3438 |
| 10/4/2018 | Las Vegas South Premium Outlets Unit K138, Las Vegas, Nevada | $14,692.00 | Las Vegas South Outlets, LLC c/o Simon Property Group,L.P.225 West Washington Street, Indianapolis, IN 46204-3438 |
| 6/6/2019 | Las Vegas North Premium Outlets Unit 1504, Las Vegas, NE | $28,473.00 | Las Vegas North Outlets, LLC c/o Simon Property Group,L.P.225 West Washington Street, Indianapolis, IN 46204-3438Attn:Premium Outlets |
| 5/13/2023 | Lenox Square, Room 2032B, Atlanta, GA | $15,528.00 | Simon Property Group, L.P. The Retail Property Trust c/o M.S. Management Associates Inc. 225 West Washington Street, Indianapolis, IN 46204-3438 |
| 10/25/2018 | The Mills at Jersey Gardens Kiosk No. | $13,028.00 | Simon Property Group, L.P. JG Elizabeth II, LLC c/o M.S. Management Associates, Inc. |

| | K109, Elizabeth, NJ | | 225 West Washington Street, Indianapolis, IN 46204-3438 |
|---|---|---|---|
| 4/30/2018 | San Marcos Premium Outlets Unit 1180, San Marcos, TX | $15,418.00 | San Marcos Premium Outlets, L.P. c/o Simon Property Group,L.P.225 West Washington Street, Indianapolis, IN 46204-3438 |

4. Leases being Rejected Pursuant to the Plan.

| Vacate date | Premises | Total landlord charges (monthly occupancy costs) | Landlord/Notice Address |
|---|---|---|---|
| 8/20/2023 | International Plaza, Tampa, FL | $11,964 | Tampa Westshore Associates L.P., 200 E. Long Lake Road, P.O. Box 200, Bloomfield Hills, MI 48303-0200 |
| Upon opening of Westland Mall store | Westland Mall – Kiosk | $7,959.00; Debtor will pay the monthly occupancy cost until the Westland Mall store is opened, at which time this lease will be deemed rejected. Landlord will have 30 days to file any claim after rejection of the Westland Mall Kiosk. For the avoidance of doubt, landlord's rejection damages may include clean-up and damage repair costs, or | Westland Mall, LLC, 591 West Putnam Ave., Greenwich, CT 06830 |

8

| | | rejection damages, if any. | |
|---|---|---|---|
| 1/5/2024 | Orlando – Vineland Premium Outlets | $33,182.00 | Orlando Vineland PO, L.P., P.O. Box 827733, Philadelphia, PA 19182-7733 |
| 1/5/2024 | Times Square | $104,607.00 | 1535 Broadway LLC, c/o Vornado Office Management LLC, 888 Seventh Ave, New York, NY 10019 |
| 1/5/2024 | Aventura Mall | $23,116.89 | Aventura Mall Venture, c/o Turnberry Aventura Mall Company, Ltd., 19501 Biscayne Boulevard, Suite 400, Aventura, FL 33180 |

5. Leases being Assumed Pursuant to the Plan.

| Premises | Landlord/Notice Address |
|---|---|
| University Mall - Sarasota | Taubman Benderson UTC LLC, 200 E. Long Lake Road, P.O. Box 200, Bloomfield Hills, MI 48303<br><br>The Debtor is assuming the lease with UTC as-is, without modifications. This Confirmation Order controls over contrary treatment of the UTC lease in the Plan, including but not limited to any attempt to modify the lease by (1) extending the lease term by five years through October 31, 2029, and (2) replacing Island Cabo SA with Retailing Enterprises PR LLC as the guarantor of the lease. *See* ECF 446, p. 26-27. If there is any language regarding the assumption of the UTC lease in the Plan that contradicts the Debtor assuming the UTC lease as-is without modifications, the language of this Order shall control. |
| Sawgrass | Sunrise Mills (MLP) Limited Partnership, c/o M.S. Management Associates Inc., 225 W. Washington Street, Indianapolis, IN 46204-3438<br><br>The Debtor is assuming the lease with Sunrise Mills (MLP) Limited Partnership as-is, without modifications. |
| Orlando – Intl. Prem. Outlets | Orlando Outlet Owner LLC, c/o Simon Property Group, 225 West Washington Street, Indianapolis, IN 46204-3438, Attn: Premium Outlets |

| | |
|---|---|
| | The Debtor is assuming the lease with Orlando Outlet Owner, LLC as-is, without modifications. |
| Tanger - Daytona | Tanger Daytona, LLC, c/o Tanger Management, LLC, 3200 Northline Avenue, Suite 360, Greensboro, NC 27408<br><br>The Debtor is assuming the lease with Tanger Daytona, LLC as-is, without modifications. |
| Tanger - Glendale | Outlets at Westgate, LLC, c/o Tanger Management, LLC, 3200 Northline Avenue, Suite 360, Greensboro, NC 27408<br><br>The Debtor is assuming the lease with Outlets at Westgate, LLC as-is, without modifications. |
| Tanger – Palm Beach | Palm Beach Outlets I, LLC, C/o Clarion Partners, 230 Park Avenue, New York, NY 10169, Attn: Sean O'Connor<br><br>The Debtor is assuming the lease with Palm Beach Outlets I, LLC as-is, without modifications. |
| El Paso | El Paso Outlet Center CMBS, LLC, c/o Horizon Group Properties Inc., 131 West Seaway Drive, Suite 220, Muskegon, MI 49444<br><br>The Debtor is assuming the lease with El Paso Outlet Center CMBS, LLC as-is, without modifications. |
| Christiana - Brookfield | Christiana Mall LLC, c/o Christiana Mall, 110 N. Wacker Dr., Chicago, IL 60606, Attn: Law/Lease Administration Department<br><br>The Debtor is assuming the lease with Christiana Mall LLC with modified terms as described in paragraph 4(r) Class 14E of this Order. |
| North Star Mall - Brookfield | North Star Mall, LLC, c/o North Star Mall, 350 N. Orleans St., Suite 300, Chicago, IL 60654-1607, Attn: Law/Lease Administration Department<br><br>The Debtor is assuming the lease with North Star Mall, LLC with modified terms as described in paragraph 4(r) Class 14E of this Order. |
| Perimeter - Brookfield | Perimeter Mall, LLC, c/o Perimeter Mall, 350 N. Orleans St., Suite 300, Chicago, IL 60654-1607, Attn: Law/Lease Administration Department<br><br>The Debtor is assuming the lease with Perimeter Mall, LLC as-is, without modifications. |

| Elmhurst (Queens Center) - Macerich | Queens Center SPE LLC, 90-15 Queens Boulevard, Elmhurst, NY 11373-4900, Attention: Center Manager<br><br>The Debtor is assuming the lease with Queens Center SPE LLC as-is, without modifications. |
|---|---|
| Westfield - Brandon | Brandon (Tampa) LP, c/o CentreCorp Management Services LLLP 459 Brandon Town Center, Dr., Brandon, FL 33511 Attn: Katie Woolridge<br><br>The Debtor is assuming the lease with Brandon (Tampa) LP as-is, without modifications. |
| Westland Mall | Westland Mall, LLC, 591 West Putnam Ave, Greenwich, CT 06830. [There is no arrearage owed for this location.]<br><br>The Debtor is assuming the lease with Westland Mall, LLC as-is, without modifications. |
| Prince George's | PR Prince George's Plaza LLC, c/o PREIT Services, LLC, 2005 Market Street, Suite 1000, Philadelphia, PA 19103<br><br>The Debtor is assuming the lease with PR Prince George's Plaza LLC, as-is, without modifications. |
| Cross County (Brooks Shopping Centers, LLC ("Brooks") – Yonkers, NY) | Brooks Shopping Centers LLC<br>c/o Marx Realty and Improvement Company, Inc., Attn: Jagdish Shah, Chief Financial Officer, Marx Realty, 10 Grand Central, 155 East 44th Street, New York, NY 10017<br><br>With a copy to:<br>Carl Calabro, Senior Manager, Property Management at CCC, Marx Realty, Cross County Center, 8000 Mall Walk, Yonkers, NY 10704, P: (914)968-9571, E: Carl.C@marxrealty.com<br><br>The Debtor is assuming the lease with Brooks with modified terms as described in paragraph 4(u) <u>Class 14H</u> of this Order. |
| 405 Southwest | 405 Southwest Real Estate Company, LLC, 405 SW 148 Ave Suite #1, Davie, FL 33325<br><br>The Debtor is assuming the lease with 405 Southwest Real Estate Company, LLC as-is, without modifications. |

6.  Contracts Being Assumed Pursuant to the Plan.

| Counterparty | Type | Original start date and term | Cure treatment |
|---|---|---|---|
| AFCO Credit Corp. | Insurance premium finance agreement | 2/28/23 11 mos. | n/a |
| Affirm, Inc. | Installment and split pay services | 3/22/23 1 yr. | $13,166.67/mo. for 6 mos. commencing 1st of the month following Effective Date |
| Dell Financial Services, L.L.C. | Computer equipment and software | 10/5/22 3 yrs. | n/a |
| Extend, Inc. | Extended warranties | 5/11/22 3 yrs. | $20,000/mo. for 6 mos. commencing 1st of the month following Effective Date |
| Invicta Watch Company of America, Inc. | Royalty agreement | 5/21/21 | n/a |
| Invicta Watch Company of America, Inc. | Distribution agreement | 5/14/19 | n/a |
| Mauricio Krantzberg | Licensing agreement | 11/1/2015 – 12/31/30 | n/a |
| PayPal, Inc./Braintree | Credit card processing | 03/2021 | n/a |
| Salesforce, Inc. | Marketing | 7/22/22- 11/28/23 | $20,356.40/mo. for 6 mos. commencing 1st of the month following Effective Date |

Unless otherwise ordered by the Bankruptcy Court, any Claims for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the date that is **ten (10) days after the Confirmation Date** or such Claim shall be forever barred and unenforceable against Debtor, Reorganized Debtor, or the assets of either of them. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to persons

who may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the deadline for filing a Claim for rejection damages in connection therewith.

K.    **Additional Plan Provisions – 11 U.S.C. § 1123(b)(6)**. Each provision of the Plan is appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

L.    **Principal Purpose of the Plan – 11 U.S.C. § 1129(d)**. The principal purpose of the plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

M.    With respect to the relevant provisions of § 1129(a), the Court finds and concludes as follows:

1.    **11 U.S.C. § 1129(a)(1) and (a)(2)**. The Plan and the Plan Proponent comply with the applicable provisions of the Bankruptcy Code.

2.    **11 U.S.C. § 1129(a)(3)**. The Plan was proposed in good faith and not by any means forbidden by law.

3.    **11 U.S.C. § 1129(a)(4)**. Any payment made or to be made by the Debtor, for services or for costs and expenses in or in connection with the case, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable.

4.    **11 U.S.C. § 1129(a)(5)**. The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor, an affiliate of the Debtor participating in

13

a joint plan, or a successor to the Debtor under the Plan. The Debtor also has disclosed the identity of any insider who will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider. The appointment to, or continuance in, such office of such individual is consistent with the interests of creditors, equity security holders, and public policy.

5.    **11 U.S.C. § 1129(a)(7)**. The Plan provides that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest property of a value, as of the Effective Date[2] of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of this title on such date. The Plan also provides that, with respect to Class 11 to which § 1111(b)(2) applies, pursuant to 11 U.S.C. 1129(a)(7)(B), the Class 11 claimholder will receive or retain under the Plan on account of its claim property of a value, as of the Effective Date, that is not less than the value of the Class 11 claimholder's interest in the estate's interest in the property that secures its claim.

6.    **11 U.S.C. § 1129(a)(8)**. With respect to each class of claims or interests (A) such class has accepted the Plan; or (B) such class is not impaired under the Plan. 19 classes all voted to accept the Plan: Classes 1, 2, 3, 4, 5, 6,

---

[2] Capitalized terms not described herein shall have the meanings assigned to them in the Plan.

7, 8, 9, 10, 13, 14A, 14B, 14D, 14E, 14G, 14H, 15, and 16. Class 1, 2, and 3 Claimholder CNB; Class 4 Claimholder Bexar; Class 5 Claimholder PGC; Class 6 Claimholder Dekalb; Class 7 Claimholder Hays; Class 8 Claimholder Hillsborough; Class 9 Claimholder SM CISD; Class 10 Claimholder Broward; Class 13 Claimholder Invicta; Class 14A Claimholder TB; Class 14B Claimholders Orlando Outlet Owner LLC and Sunrise Mills (MLP) Limited Partner; Class 14D Claimholder El Paso; Class 14E Claimholder Brookfield; Class 14G Claimholder PR Prince George's; Class 14H Claimholder Brooks; Class 15 Claimholders Las Vegas North Outlets, Jersey Shore Premium Outlets, HG Galleria, LLC, Florida Mall Associates LTD, Fashion Centre Mall, LLC, Simon, Arundel Mills Limited Partnership, Miami International LLC, Mall of Georgia LLC, the Retail Property Trust, Orlando Vineland PO LP, Newport Centre LLC, Plaza Carolina Mall, L.P., Premium Outlet Partners LP, the Town Center at Boca Raton, JG Elizabeth II, LLC, San Marco Premium Outlets, CNB, Mauricio Krantzberg, Westland Mall, LLC, Aventura Mall Venture and 1535 Broadway LLC; and Class 16 Claimholder Mauricio Krantzberg have accepted the Plan. As the total claims of the accepting creditors in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 14A, 14B, 14D, 14E, 14G, 14H, 15, and 16 are more than two-thirds in number and amount (specifically, 100%), each respective Allowed Class has accepted the Plan.[3] The Court finds

---

[3] Class 11 has elected to proceed under 11 U.S.C. § 1111(b) and therefore the Plan complies with § 11 U.S.C. 1129(a)(7)(B) with respect to Class 11. In addition, Classes 12 and all of the sub-classes under Class 14 are assumed leases or assumed executory contracts and are

that, with respect to the non-voting Classes 12, 14C, 14F, 14I, 14J, and 14K, whose claims are related to unexpired leases and contracts, as well as Class 11 which elected to proceed under 11 U.S.C. § 1111(b), such classes are deemed unimpaired and therefore are conclusively presumed to have accepted the Plan.

7.    **11 U.S.C. § 1129(a)(9)**. Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that:

With respect to a claim of a kind specified in 11 U.S.C. § 507(a)(8), the holder of such claim will receive on account of such claim regular installment payments in cash of a total value, as of the Effective Date, equal to the allowed amount of such claim, over a period ending not later than 5 years after the date of the order for relief. More specifically, Priority Tax Claims are described in Section 507(a)(8) of the Bankruptcy Code. The Debtor estimates the total Allowed Priority Tax Claims are as follows:

| Payee | Approximate Claim Amount |
|---|---|
| Arizona DOR | $0.00 |
| City of Hyattsville | $7,306.87 |
| Clark County Nevada Tax Collector | $722.24 |
| Comptroller of Maryland | $22,646.24 |
| Florida DOR | $321,283.02 |

---

therefore unimpaired pursuant to 11 U.S.C. § 1124(2)(A), as the Plan cures all defaults which occurred before or after the commencement of the instant case.

| | |
|---|---|
| Fulton County Tax Collector | $6,575.14 |
| Georgia Department of Revenue | $49,161.81 |
| Miami Dade County Tax Collector | $1,421.10 |
| Miami Dade County Tax Collector | $4,935.00 |
| NYC Department of Finance | $165,328.08 |
| Orange County Tax Collector | $3,962.57 |
| Orange County Tax Collector | $3,987.86 |
| Orange County Tax Collector | $868.19 |
| Sarasota County Tax Collector | $1,056.19 |

8.      **11 U.S.C. § 1129(a)(10)**. If a class of claims is impaired under the Plan, at least one class of claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the plan by any insider.

9.      **11 U.S.C. § 1129(a)(11)**. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

10.     **11 U.S.C. § 1129(a)(12)**. All fees payable under 28 U.S.C. § 1930, as determined by the Court at the Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

11.     **11 U.S.C. § 1129(a)(16)**. All transfers of property under the Plan shall be made in accordance with any applicable provisions of non-bankruptcy

law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

N.    As to the Disclosure Statement, noting that no parties objected to the adequacy of the information contained in the Disclosure Statement, and after hearing proffers of Debtor's counsel, the Court finds that the Disclosure Statement contains "adequate information" pursuant to 11 U.S.C. § 1125.

**ACCORDINGLY**, and based on the above, the Court **ORDERS** as follows:

1.    **Confirmation**. The Plan is CONFIRMED pursuant to 11 U.S.C. § 1129, including as modified herein, which modifications are approved under Section 1127 of the Bankruptcy Code. In connection with confirmation of the Plan, the Court has considered and admitted the Debtor's submitted Exhibits 1 through 14 as evidence in support of confirmation of the Plan. *See* ECF 603.

2.    **Disclosure Statement Approval**. The Disclosure Statement is APPROVED on a final basis pursuant to 11 U.S.C. § 1125.

3.    **Objections**. The CNB Objection and the UTC Objection are resolved by the terms of this Order in respect of the treatment of the CNB claims and the UTC lease, which terms supersede and modify the corresponding terms of the Plan.

4.    **Binding Effect of Plan**. Pursuant to 11 U.S.C. § 1141(a), except as provided in § 1141(d)(2) and (3), the provisions of the Plan, as of the Effective Date, bind the Debtor and any creditor, equity security holder, or general partner in the Debtor, whether or not the claim or interest of such creditor, equity security holder,

or general partner is impaired under the Plan and whether or not such creditor, equity security holder, or general partner has accepted the Plan.

5. **Treatment of claims and interests**.

a. <u>Class 1</u>. As to the CNB claim relating to the Revolving Note, the Debtor will make no further payments on CNB's Revolving Note, which debt has been satisfied in full. In accordance with the settlement terms agreed to by the Debtor and CNB during the parties' post-petition judicial settlement conference that occurred on November 10, 2023 (the "CNB JSC"), CNB liquidated a securities brokerage account pledged to CNB and owned by Newport Ventures Ltd. ("Newport") on or around November 10, 2023 in the amount of $5,901,009.90 (the "Newport Proceeds"). On or around November 17, 2023, CNB applied a portion of the Newport Proceeds to the Revolving Note as well as to pay an amount equal to $200,000.00 of CNB's professional fees, which reduced the outstanding balance payable on the Revolving Note to $0. No prepayment penalty was charged by CNB, notwithstanding CNB's contractual right to a 2% penalty.

b. <u>Class 2</u>. As to the CNB claim relating to the 2021 Note, the terms of CNB's 2021 Note are modified as follows: The line of credit will be converted to a commercial term loan, and the interest rate will be fixed at 4.25%. Commencing on the Effective Date, the Debtor will make interest-only monthly payments based on the CNB Remaining Balance through and including December 2024. Commencing January 2025, the Debtor will make monthly

19

principal and interest payments, as listed in Section 16 of the Debtor's revised Exhibit "A" to the Disclosure Statement,[4] through and including December 2026. On December 31, 2026, any and all outstanding amounts due and owing under the 2021 Note will be paid in full as a balloon payment. All prepayment penalty provisions under the 2021 Note will be eliminated; that is, the Debtor may prepay any amount of the 2021 Note without penalty. Except as modified herein, the remaining terms of the prepetition loan documents for the 2021 Note will remain unchanged, and the obligations of the Debtor and any other person or entity who guaranteed such obligations under such prepetition loan documents, as well as the liens and security interests granted to CNB thereunder, shall continue in full force and effect post-Confirmation.[5] In addition, nothing in the Plan or this Order shall modify or limit the terms of that certain Subordination of Debt and Inventory Buy Back Agreement, dated October 29, 2018, by and between CNB and Invicta Watch Company of America (as amended from time to time, the "Invicta Buy Back Agreement"), which Invicta Buy Back Agreement shall remain in full force and effect until CNB's Class 2 claim is paid in full. If and to the extent the treatment of the Class 2 claim of CNB herein is inconsistent with the provisions of the Plan,

---

[4] *See* ECF 507.

[5] In addition, Newport shall retain its subrogation rights under section 509(a) of the Bankruptcy Code in the amount of the Newport Proceeds ($5,901,009.90) as Newport was liable with the Debtor on this loan, and paid said claim, and thus is subrogated to the rights of CNB to the extent of the payment of the Newport Proceeds, which subrogation rights are subject to the provisions of the Plan and the terms of the CNB JSC, including that such rights are and shall remain subordinate to the rights of CNB, including under the Main Street Loan.

then the provisions of this Order shall control.

      c.     <u>Class 3</u>. As to the CNB claim relating to the 2023 Note, the Debtor will make no further payments on CNB's 2023 Note, which debt has been satisfied in full in accordance with the settlement terms agreed to by the Debtor and CNB during the CNB JSC. Specifically, CNB liquidated Newport's securities brokerage account on or around November 10, 2023, and on or around November 17, 2023, CNB applied the proceeds from that securities account to the 2023 Note, which proceeds satisfied in full the outstanding balance due on the 2023 Note. No prepayment penalty was charged by CNB, notwithstanding CNB's contractual right to a 2% penalty.

      d.     <u>Class 4</u>. As to Bexar's secured tax claim, Bexar will receive deferred cash payments over a period not to exceed five (5) years from the Petition Date, as follows. The Reorganized Debtor will pay Bexar $14,817.18 through equal, consecutive monthly installments, with the first payment being made on the Initial Payment Date, amortized over a period not to exceed five (5) years from the Petition Date. Postpetition interest will accrue at the rate of 12% per annum from the Petition Date until the Effective Date, and thereafter, Plan interest at the rate of 12% per annum shall accrue on the entire balance until the tax debt is paid in full. The appraised value of the property securing the Bexar claim is $257,770.00.

The Reorganized Debtor may prepay the prepetition tax debt to the taxing authorities at any time. The Bexar tax claim shall retain its statutory

lien securing its prepetition and any postpetition tax debts until such time as the tax debts are paid in full. The Reorganized Debtor will pay all post-petition ad valorem tax liabilities (tax year 2024 and subsequent tax years) owing to Bexar in the ordinary course of business as such tax debt comes due and prior to said ad valorem taxes becoming delinquent without the need of the taxing authorities to file an administrative expense claim and/or request for payment pursuant to 11 U.S.C. § 503(b)(1)(D).

Should the Reorganized Debtor fail to make any payments as required in this Plan, Bexar shall provide written notice of that default to the Reorganized Debtor and Debtor's attorney advising of that default, and providing the Reorganized Debtor with a period of 15 days to cure the default. In the event that the default is not cured within 15 days, Bexar may, without further order of this Court or notice to the Reorganized Debtor, pursue all of its rights and remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. Additionally, the failure to timely pay postpetition and/or post-confirmation taxes while the Reorganized Debtor is still paying any prepetition debt, shall be considered an event of default. Bexar shall provide Reorganized Debtor and its attorney with written notice of that default and afford a 15-day opportunity to cure said default. In the event that the Reorganized Debtor fails to timely cure the post-petition and/or post-confirmation default, Bexar may, without further order of this court or notice to the Reorganized Debtor, pursue all of its rights and

remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. The Reorganized Debtor shall be entitled to no more than three Notices of Default. In the event of a fourth default, Bexar may pursue all rights and remedies available to it under the Texas Property Tax Code in state district court without further order of this court or further notice to the Reorganized Debtor.

e.    Class 5. As to the Allowed Secured Tax Claim of PGC, the Class 5 Claimholder will receive deferred cash payments over a period not to exceed five years from the Petition Date, of a value, as of the Effective Date of the Plan[6], equal to the amount of the Allowed Claims, plus statutory interest.

f.    Class 6. As to the Allowed Secured Tax Claim of Dekalb, the Class 6 Claimholder will receive deferred cash payments over a period not to exceed five years from the Petition Date, of a value, as of the Effective Date of the Plan, equal to the amount of the Allowed Claim, plus statutory interest.

g.    Class 7. As to the Allowed Secured Tax Claim of Hays, the Allowed amount of $6,649.01 will be paid in full through equal, consecutive monthly installments, with the first payment being made on the Initial Payment Date amortized over a period not to exceed five years from the Petition Date. Postpetition interest will accrue at the rate of 12% per annum

---

[6] As of the date of this Order, the Class 5 Claimholder has filed secured claims totaling $43,974.38 as follows: (i) POC No. 2-1 in the amount of $16,484.18 for Fiscal Year 2023 Personal Property Taxes, (ii) POC No. 3-3 in the amount of $13,745.10 for Fiscal Year 2024 Personal Property Taxes, and (iii) POC No. 95-1 in the amount of $13,745.10 for Estimated Fiscal Year 2025 Personal Property Taxes.

from the Petition Date until the Effective Date, and thereafter, Plan interest at the rate of 12% per annum shall accrue on the entire balance until the tax debt is paid in full. The 2023 appraised value of the property securing the Allowed Secured Tax Claim of Hays is $339,010.00.

The Reorganized Debtor may prepay the prepetition tax debt to the taxing authorities at any time. Hays shall retain its statutory lien securing its prepetition and any postpetition tax debts until such time as the tax debts are paid in full. The Reorganized Debtor shall pay all postpetition ad valorem tax liabilities (tax year 2024 and subsequent tax years) owing to Hays in the ordinary course of business as such tax debt comes due and prior to said ad valorem taxes becoming delinquent without the need of the taxing authorities to file an administrative expense claim and/or request for payment pursuant to 11 U.S.C. § 503(b)(1)(D).

Should the Reorganized Debtor fail to make any payments as required in this Plan, Hays shall provide written notice of that default to the Reorganized Debtor and Debtor's attorney advising of that default and providing the Reorganized Debtor with a period of 15 days to cure the default. In the event the default is not cured within 15 days, Hays may, without further order of this Court or notice to the Reorganized Debtor, pursue all of its rights and remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. Additionally, the failure to timely pay postpetition and/or post-confirmation taxes while the

Reorganized Debtor is still paying any prepetition debt, shall be considered an event of default. Hays shall provide Reorganized Debtor and its attorney with written notice of that default and afford a 15-day opportunity to cure said default. In the event the Reorganized Debtor fails to timely cure the post-petition and/or post-confirmation default, Hays may, without further order of this court or notice to the Reorganized Debtor, pursue all of its rights and remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. The Reorganized Debtor shall be entitled to no more than three Notices of Default. In the event of a fourth default, Hays may pursue all rights and remedies available to it under the Texas Property Tax Code in state district court without further order of this court or further notice to the Reorganized Debtor.

      h.    <u>Class 8</u>. As to the Allowed Secured Tax Claim of Hillsborough, the Class 8 Claimholder will receive deferred cash payments over a period not to exceed five years from the Petition Date, of a value, as of the Effective Date of the Plan, equal to the amount of the Allowed Claims, plus statutory interest.

      i.    <u>Class 9</u>. As to the Allowed Secured Tax Claim of SM CISD, the Reorganized Debtor shall pay SM CISD $7,160.60 through equal, consecutive monthly installments, with the first payment being made on the Initial Payment Date, amortized over a period not to exceed five years from the Petition Date. Postpetition interest will accrue at the rate of 12% per annum from the Petition Date until the Effective Date, and thereafter, Plan interest

at the rate of 12% per annum shall accrue on the entire balance until the tax debt is paid in full. The assessment value of the property securing the SM CISD claim is $296,510.00.

The Reorganized Debtor may prepay the prepetition tax debt to the taxing authorities at any time. The SM CISD tax claim shall retain its statutory lien securing its prepetition and any postpetition tax debts until such time as the tax debts are paid in full. The Reorganized Debtor shall pay all postpetition ad valorem tax liabilities (tax year 2024 and subsequent tax years) owing to SM CISD in the ordinary course of business as such tax debt comes due and prior to said ad valorem taxes becoming delinquent without the need of the taxing authorities to file an administrative expense claim and/or request for payment pursuant to 11 U.S.C. § 503(b)(1)(D).

Should the Reorganized Debtor fail to make any payments as required in this Plan, SM CISD shall provide written notice of that default to the Reorganized Debtor and Debtor's attorney advising of that default and providing the Reorganized Debtor with a period of 15 days to cure the default. In the event that the default is not cured within 15 days, SM CISD may, without further order of this Court or notice to the Reorganized Debtor, pursue all of its rights and remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. Additionally, the failure to timely pay postpetition and/or post-confirmation taxes while the Reorganized Debtor is still paying any pre-petition debt, shall be considered

an event of default. SM CISD shall provide Reorganized Debtor and its attorney with written notice of that default and afford a 15-day opportunity to cure said default. In the event that the Reorganized Debtor fails to timely cure the postpetition and/or post-confirmation default, SM CISD may, without further order of this court or notice to the Reorganized Debtor, pursue all of its rights and remedies available to it under the Texas Property Tax Code to collect the full amount of all taxes, penalties and interest owed. The Reorganized Debtor shall be entitled to no more than three Notices of Default. In the event of a fourth default, SM CISD may pursue all rights and remedies available to it under the Texas Property Tax Code in state district court without further order of this court or further notice to the Reorganized Debtor.

j.      <u>Class 10</u>. As to the Allowed Secured Tax Claims of Broward, the Class 10 Claimholder will receive deferred cash payments over a period not to exceed five years from the Petition Date, of a value, as of the Effective Date of the Plan, equal to the amount of the Allowed Claims, plus statutory interest.

Broward will retain its statutory liens on the Debtor's tangible personal property within the geographic boundaries of Broward County until such liens are satisfied. Until payment is made, the Debtor will retain sufficient tangible personal property within the geographic boundaries of Broward County to cover the tax due.

k.      <u>Class 11</u>. As to the Allowed Secured Claim of Ally relating to a vehicle loan, Ally has elected to have its claim treated under 1111(b).

27

Therefore, the Debtor will pay to Ally the amount of its secured claim ($23,531.55) over a period of 10 years, with the remaining balance of its claim to be paid as a balloon payment at such time. The collateral vehicle is worth $20,154.25. Pursuant to 1111(b), Ally is entitled to the nominal amount of its claim without interest. Consequently, the Debtor will pay Ally $117.40 per month for 10 years, with a balloon payment at the end of the 10-year period of the outstanding amount owed. The Debtor may prepay any or all of the amounts owed to Ally without incurring any prepayment penalties.

l.    Class 12. As to the Allowed Secured Claim of Dell, except to the extent that Dell has been paid before the Effective Date or agrees to a different treatment, Dell will be paid the secured amount of its claim over five years, fully amortized, at an annual rate of 5%, for a monthly payment of $462.64, commencing on the Initial Payment Date. The new 5-year amortization period will begin on the Effective Date of the Plan. There will be no prepayment penalty in the event Debtor pays all or a portion of the unpaid principal balance before the maturity date. Except as modified herein, the remaining terms of the prepetition loan documents will remain unchanged.

m.    Class 13. As to the Allowed Claim of Invicta, the Debtor shall assume the Distribution Agreement with Invicta as modified in the Plan and restated herein. The Reorganized Debtor will pay Invicta $30,000,000.00 over 10 years, which amount is payable in yearly installments of $3,000,000.00 (the "Annual Payment") and accrues interest at 6.5% per annum. The Annual

Payment is due on the 31st of December, beginning December 31, 2024, and ending December 31, 2033. A balloon payment for the accrued interest is due December 31, 2033. However, if the Reorganized Debtor does not default on any of the Annual Payments, Invicta will waive the accrued interest.

If the Reorganized Debtor purchases a minimum of $40,000,000.00 in finished inventory from Invicta per year (pre-paid/C.O.D.), Invicta will give the Reorganized Debtor an annual $3,000,000.00 rebate, which rebate the Debtor may apply to reduce the Invicta Claim by $3,000,000.00 each year (i.e. the Reorganized Debtor will not make its Annual Payment). Therefore, as long as the Reorganized Debtor continues to purchase said minimum amount for 10 years[7], the Invicta Claim will be reduced to zero and Invicta will receive no direct distribution under the Plan. The Reorganized Debtor may not satisfy the minimum purchase amount of $40,000,000.00 in any given year by carrying over payments above $40,000,000.00 from a prior year. Moreover, the Debtor must make its purchases of Invicta product by prepayment or by cash on delivery.

If the Reorganized Debtor does not purchase a minimum of $40,000,000.00 in finished inventory from Invicta in any single calendar year, then the following rebate structure shall apply:

(i)     For $35,000,000.00 to $39,999,999.00 in purchases in a given year, Invicta will give the Reorganized Debtor a $2,500,000.00 rebate;

---

[7] Any remaining amount over $30,000,000.00, estimated to be $831,801.33, will be deducted the following year as long as the Debtor purchases its annual minimum.

(ii)     For $30,000,000.00 to $34,999,999.00 in purchases in a given year, Invicta will give the Reorganized Debtor a $2,000,000.00 rebate; and

(iii)     For purchases less than $30,000,000.00 in a given year, Invicta will not give the Reorganized Debtor any rebate.

(iv)     In the event that the rebate for any single year does not cover the full amount of Annual Payment, Debtor shall be required to pay in cash any difference between the Annual Payment and the applicable rebate amount for any given year, as applicable.

For the avoidance of doubt, in the event that the Debtor does not purchase a minimum of $30,000,000.00 from Invicta in any single calendar year, a cash payment of $3,000,000.00 shall be required to be made by the Debtor to Invicta for any such year. If the Reorganized Debtor defaults on its payment obligations to Invicta, under the terms of this Plan or the assumed Distribution Agreement, the entire remaining balance of the Invicta Claim will become due and payable.

n.     Class 14A. As to the Allowed Claim of UTC relating to the University Town Center – Sarasota lease, UTC will be paid $14,923.85 by way of two monthly installments of $7,461.93, commencing on the Initial Payment Date[8].

---

[8] Contrary to the assertion in POC 46-1, there are no postpetition amounts owed to this landlord as the Debtor is current on its rent payments.

o.  <u>Class 14B</u>. As to the Allowed Claims of Simon[9] relating to various lease agreements with the Debtor, the Debtor and Simon agree to the following:

i.  <u>Sawgrass Mills and Orlando International Premium Outlets</u>. On the Initial Payment Date, the Debtor will pay Simon (a) $1,460,000.00 in one lump sum for the assumption of the Sawgrass Mills ("Sawgrass") and Orlando International Premium Outlets ("Orlando Outlets") leases (collectively, the "Assumed Leases"), plus (b) $180,000.00 for 4 months of security deposits. Simon does not object to the Debtor's assumption of the Assumed Leases, and the Debtor shall continue to pay postpetition rent in the ordinary course as to the Sawgrass and Orlando Outlets locations.

ii.  <u>Plaza Carolina Mall, L.P.</u> As to Plaza Carolina Mall, L.P.'s ("Plaza Landlord") eviction action pending in Puerto Rico against PR Retailing, PR Retailing has paid the Plaza Landlord $329,478.35 in one lump sum to cure the arrearage plus fees under the related lease.

iii.  <u>Lenox Square/Registry Funds</u>. The Debtor shall no longer contest and shall allow The Retail Property Trust ("Lenox

---

[9] "Simon" includes its subsidiaries and affiliates, including affiliated landlords.

Landlord") to recover $411,001.69 (the "Funds") held in the Georgia state court registry ("Registry"). In order to promptly effectuate the Lenox Landlord's recovery of the Funds, the Debtor shall fully cooperate by executing and filing whatever documents are needed including, but not limited to: (i) a stipulation in the Debtor's bankruptcy case for immediate relief from the automatic stay so that the Lenox Landlord can recover the Funds on deposit in the Registry; (ii) dismissal of the pending appeal with prejudice; and (iii) any other stipulations, notices or other written submissions required to cause the prompt release of the Funds in the Registry to the Lenox Landlord.

iv.  <u>Acceptance of Plan</u>. By agreement of the parties, and subject to the terms incorporated herein, Simon has submitted ballots, on behalf of all its claimants and claims, accepting the Plan. In addition, Simon does not object to confirmation of the Debtor's Plan and/or approval or adequacy of the Debtor's Disclosure Statement, and supports the Debtor's Plan and confirmation of the Debtor's Plan, given that the Plan incorporates the terms of the agreement reached at the Judicial Settlement Conference.

v.  <u>Debtor's objections to Simon claims</u>. The Debtor has

withdrawn all of its objections to claims of Simon. *See* ECF 549, 550, 551, and 552.

vi.    <u>Allowed General Unsecured Claims of Simon</u>. The Debtor stipulates to Simon's full claim amounts, which are allowed as general unsecured claims under Class 15 of the Plan, as follows:

1. Fashion Centre Mall, LLC: $430,725.47

2. Jersey Shore Premium Outlets, LLC: $316,018.82

3. Las Vegas South Outlets, LLC: $422,866.10

4. Mall of Georgia LLC: $173,243.05

5. Newport Centre LLC: $140,534.43

6. HG Galleria LLC: $810,676.95

7. Plaza Carolina Mall, L.P.: $222,120.67

8. The Retail Property Trust: $114,055.13

vii.    <u>Pending Litigation</u>. As to all pending litigation (collectively, the "Actions"), filed by or defended by the Debtor, PR Retailing and/or Simon (collectively, the "Simon Settling Parties") including, but not limited to the list of Actions below, the Simon Settling Parties agree to:

1. mutually release one another from any and all claims arising from or related to any and all claims asserted by the Simon Settling Parties in the Actions (including claims, counterclaims and third-party claims);

2. file notices of dismissal of the Actions with prejudice or stipulations for dismissal of the Actions with prejudice, as the case may be; and

3. execute any additional papers necessary to effectuate the intent herein, which is to dismiss all actions and their included claims, counterclaims, and third-party claims.

<u>List of Actions:</u>

1. *Simon Property Group, L.P. and Sunrise Mills (MLP) Limited Partnership v. Retailing Enterprises, LLC* (Case No. CACE 20 014074 (18), in the Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida.

2. *The Retail Property Trust v. Retailing Enterprises, LLC*, Cause No. 21ED195587 in the Magistrate Court of Fulton County, Georgia, docketed as Cause No. 2022CV365115 in the Superior Court of Fulton County, Georgia, and as Cause No. A23A1542 in the Court of Appeals of Georgia.

3. *Puerto Rico Premium Outlets: Plaza Carolina Mall, L.P. v. Retailing Enterprises PR, Inc.,* Cause No. AR2021CV01749 in the First Instance Court of Arecibo, Puerto Rico.

4. *San Marcos Premium Outlets: San Marcos Premium Outlets, L.P. v. Retailing Enterprises, LLC,* Cause No. F21-112J11 in the Justice of Peace Court, Precinct 1, Hays County, Texas.

5. *The Mills at Jersey Gardens: JG Elizabeth II LLC v. Retailing Enterprises, LLC,* Cause no. UNN-LT-1406-21, in the Superior Court of New Jersey Law Division - Union County.

6. *Las Vegas North Premium Outlets and Las Vegas South Premium Outlets: Las Vegas North Outlets, LLC and Las Vegas South Outlets, LLC v. Retailing Enterprises, LLC,* Cause No. A-21-843308-B in the Eighth Judicial District Court for Clark County, Nevada, Dept: XVI.

7. *Orlando Vineland Premium Outlets: Orlando Vineland PO, L.P. v. Retailing Enterprises, LLC,* Cause No. 2023-CA-011395 in the Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida.

8. *Orlando International Premium Outlets: Orlando*

*Outlet Owner, LLC v. Retailing Enterprises, LLC,* Cause No. 2023-CA-011392-O in the Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida.

9. *Florida Mall Associates, Ltd. v. Retailing Enterprises, LLC,* Cause No. 2023- CA-011391 in the Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida.

viii.   Discovery. Simon shall cease all discovery directed to the Debtor, Mr. Krantzberg, PR Retailing, and Invicta.

ix.   Notices. All notices vis-à-vis the Debtor and Simon shall be provided in the following manner:

1. As to the Debtor, by email to Mauricio Krantzberg at mkrantzberg@invictastores.com with a copy to Debtor's counsel Aaron Wernick at aw@wernicklaw.com and a copy to Mr. Krantzberg's counsel Chad Pugatch at cpugatch@loriumlaw.com.

2. As to Simon, by email to Ron Tucker at rtucker@simon.com and a copy to Simon's counsel Robin Rubens at rrubens@bergersingerman.com.

p.   Class 14C. As to the Allowed Claim of PB Outlets relating to the Tanger Outlets – Palm Beach lease, PB Outlets will be paid $8,874.00 by way of two monthly installments of $4,437.00, commencing on the Initial Payment Date.

q.   Class 14D. As to the Allowed Claim of El Paso relating to the El Paso Outlet lease, El Paso will be paid $10,969.96 by way of two equal monthly installments of $5,484.98, commencing on the Initial Payment Date, with the second payment due on the first day of the following month. The Reorganized Debtor will also pay $9,000.00 for fees and charges on the Initial Payment

Date. The Debtor shall remain liable for all accrued but unbilled or not due rent and charges, including adjustments, reconciliations, and indemnity obligations under the lease.

      r.     <u>Class 14E</u>. As to the Allowed Claims of Brookfield relating to the Christiana Mall, Perimeter Mall, and North Star Mall leases (collectively, the "Leases"), Brookfield will be paid $200,000.00 on the Initial Payment Date in full satisfaction of both its Allowed Claims and the cure amounts under Bankruptcy Code § 365(b) due from the Debtor through January 31, 2024. Brookfield will also be paid a $120,000.00 cash security deposit (the "Security Deposit") upon full execution of First Amendment to Leases or the Initial Payment Date, whichever is later. The Security Deposit will be applied to all three Leases in amounts to be determined by Brookfield and incorporated in lease amendment agreements.

      Rent for the Christiana Mall location shall remain unchanged, and the lease shall be extended by 3 years, to March 31, 2027, with a 4% annual increase in rent during the extended term, as more particularly provided in the parties' Extension and First Amendment to Lease. Rent for the North Star location shall remain unchanged, and the lease shall be extended by 5 years, to September 30, 2028, with a 4% annual increase in rent during the extended term, as more particularly provided in the parties' Extension and First Amendment to Lease. The expiration date for the lease for Perimeter Mall will remain unchanged; i.e., April 30, 2030.

As an additional New Value contribution, Mr. Krantzberg shall replace Island Cabo SA as guarantor of all leases with Brookfield. More specifically, Mr. Krantzberg, as additional New Value, will personally guarantee the Reorganized Debtor's payment obligations under all three leases, with such guarantee for each lease being limited in amount to one year's rent and charges (i.e. gross rental obligations) for the subject lease plus, if applicable, all attorney's fees and costs incurred to collect default rent obligations.

The parties shall incorporate mutual releases in lease amendment agreements, which releases will include, at minimum, a release of Mr. Krantzberg and affiliates of the Debtor from alter ego, fraudulent transfer, and other clawback liabilities, and will exclude customary lease-related charges, such as accrued but unbilled and unasserted liabilities.

s.    <u>Class 14F</u>. As to the Allowed Claim of Queens relating to the Queens Center – Elmhurst lease, Queens will be paid $25,621.81 by way of two equal consecutive monthly payments of $12,810.91, commencing 30 days after the Effective Date.

t.    <u>Class 14G</u>. As to the Allowed Claim of PR Prince George relating to the Prince George's lease, PR Prince George will be paid $11,916.00 on the Initial Payment Date.

u.    <u>Class 14H</u>. As to the Allowed Claim of Brooks relating to the Cross County lease, Brooks will be paid $275,000.00 by way of 12 equal consecutive monthly installments of $22,916.67, commencing on the Initial

Payment Date. The total monthly occupancy costs will be $13,000.00 plus percentage rent of 12% of annual sales in excess of $1,400,000.00 ("Percentage Rent") for the duration of the lease. Thus, during the period of payment of Brooks' Allowed Claim, the Debtor shall pay Brooks $35,916.67 per month plus the Percentage Rent. Additionally, Retailing Enterprises PR LLC will replace Island Cabo SA as guarantor of the lease. The new expiration date of the lease will be July 31, 2026. The amended terms of the lease and replacement of the guarantor are conditioned on the Debtor's and Brooks' execution of an amendment to the lease. The Debtor shall remain liable for all accrued but unbilled or not due rent and charges, including adjustments, reconciliations, and indemnity obligations under the lease.

v.   Class 14I. As to the Allowed Claim of Extend relating to the extended warranties contract being assumed by the Debtor, Extend will be paid $120,000.00 by way of six equal monthly installments of $20,000.00, commencing on the Initial Payment Date. For the avoidance of doubt, the Debtor will also pay any administrative claims of Extend in the ordinary course of business as and when due.

w.   Class 14J. As to the Allowed Claim of Affirm relating to the virtual card and platform services contract being assumed by the Debtor, Affirm will be paid $79,000.00 by way of six equal monthly installments of $13,166.67, commencing on the Initial Payment Date.

x.   Class 14K. As to the Allowed Claim of Salesforce relating to the

38

marketing and email services contract being assumed by the Debtor, the Class 14K Claimholder will be paid $122,138.38 by way of six equal monthly installments of $20,356.40, commencing on the Initial Payment Date.

    y.    Class 15. Class 15 consists of the Allowed Claims of the general unsecured creditors.[10] As provided in additional detail in the Liquidation Analysis, attached as Exhibit "B" to the Disclosure Statement, the Court finds that if this case was converted to a Chapter 7 case, the holders of Allowed General Unsecured Claims would be paid 0% of their claims. Under the Plan, Invicta's Allowed Claim will be paid zero and, as part of his New Value contribution, Mr. Krantzberg waives his general unsecured claim against the Estate, which will maximize the distribution to all remaining holders of Allowed General Unsecured Claims. The elimination of Invicta's Allowed Claim in this Class substantially increases the distributions to be paid to the remaining holders of Allowed General Unsecured Claims.

    Except to the extent that the holder of an Allowed General Unsecured Claim has been paid before the Effective Date, or agrees to a different treatment, each holder of an Allowed General Unsecured Claim against the Debtor shall be paid up to 11.5% of the allowed amount of their respective general unsecured claim, subject to a $3,000,000.00 cap in total payments to

---

[10] As reflected in the *Revised Exhibit "A" to Amended Disclosure Statement as to Section 20: Schedule of General Unsecured Creditors* (the "Plan Financials: Section 20") [ECF 599], Debtor estimates the aggregate amount of Class 15 General Unsecured Claims (which does not include the Class 13 claim of Invicta nor the claim of Mr. Krantzberg, as addressed in Class 16) totals approximately $24,921,864.91.

be made as set forth below. Beginning on the Initial Payment Date, the Debtor will make equal quarterly payments to the holders of Allowed General Unsecured Claims, and those holders will share *pro rata* in each quarterly distribution. The maximum amount that the Debtor will pay in the aggregate to the holders of Allowed General Unsecured Claims is $3,000,000.00, and the maximum length of time during which such payments shall be made is four years.

The distribution schedule will be as follows:[11] Commencing on the first of the month following the Effective Date, $187,500.00 per quarter for 16 quarters, or such lesser amount of time as is required to pay 11.5% of the total Allowed General Unsecured Claims. Any shortfall or overage shall be applied to the final payment. Debtor may prepay any or all of the distributions described herein with no prepayment penalty, and to the extent that less than $5,000.00 remains payable to any individual creditor to satisfy 11.5% of the Allowed amount of such creditor's claim, the Debtor may satisfy that creditor's claim in full at any time as illustrated below. The *pro rata* distribution to the holders of Allowed General Unsecured Claims shall be in full satisfaction, settlement, release, and discharge of their respective Allowed General Unsecured Claims, except for the Main Street Loan claim, the treatment of

---

[11] The list of unsecured creditors in the Plan Financials: Section 20 assumes that any pending objections to claims filed by Debtor will be sustained and makes other assumptions regarding the potential resolution of other claims. The final claims numbers may be higher or lower to the extent additional claims objections are sustained or additional claims are added. Nonetheless, the total amount distributed to general unsecured creditors will be 11.5% with a cap of $3,000,000.00.

which is described below.

In addition to the distributions described above of up to 11.5% of Allowed General Unsecured Claims, or a *pro rata* share of up to $3,000,000.00, the holders of Allowed General Unsecured Claims will receive fifty percent of the net benefit resulting from post-confirmation claims' objections, as follows: The Debtor retains all rights and interests in the Claims objection process up until confirmation of the Plan. After confirmation of the Plan, the Committee will become the "Claims Administrator" and will assume control over objections to Claims and as Claims Administrator can object and/or pursue claim(s) objections at its discretion, and the Debtor will be relieved of all liability for the post-confirmation objections-to-Claims process. If the Committee reduces the Allowed amount of Claims post-confirmation, then the "net benefit" resulting from such reduction equally will be split between the Debtor and the holders of Allowed General Unsecured Claims. The "net benefit" means the positive difference between total amount that the Debtor would have been obligated to pay on account of a Claim under the Plan prior to a successful objection to such Claim by the Committee and the amount that the Debtor is required to pay on the Claim based on its Allowed amount after the objection of the Committee, in each case less the costs and expenses incurred by the Committee in the objection to such Claim.

To the extent that the Allowed amount of a claim is disputed, the Debtor will escrow such creditor's *pro rata* share of plan distributions pending final

resolution of a claim objection.

To illustrate, assume the entire General Unsecured Claims pool is comprised of four creditors, and the aggregate amount of the claims of those creditors is $26,086,956.50. Eleven and a half percent of $26,086,956.50 is $3,000,000.00; therefore, if there are no objections to claims, then the Debtor will pay $187,500.00 per quarter for a total of 16 quarters.[12]

Assume one of the three general unsecured creditors ("Creditor Z") filed a claim in the amount of $13,043,478.25 (i.e. 50% of the General Unsecured Claims pool). Assume further that the Committee objects to that claim, and in the sixth quarter, the claim objection is sustained, and the allowed amount of the claim becomes $10,000,000.00. This reduces the aggregate amount of the general unsecured claims to $23,043,478.25.

Eleven and a half percent of $23,043,478.25 is $2,650,000.00. The Debtor will have paid $2,650,000.00 by quarter 15. Distributions would occur as follows:

Q1: $187,500.00 paid by the Debtor and distributed as follows: $93,750.00 escrowed for Creditor Z, and $93,750.00 distributed to the remaining three creditors *pro rata*.

Identical distributions would be made for the next five quarters.

---

[12] If the aggregate Allowed amount of General Unsecured Claims exceeds $26,086,956.50, then the Debtor will pay $187,500.00 per quarter for a total of 16 quarters, and the general unsecured creditors will receive less than 11.5% of the Allowed amount of their respective claims in full and final satisfaction of their claims against the Debtor, provided that the Main Street Loan claim will be still entitled to receive the other consideration under the Plan and herein.

Q7: $187,500.00 paid by the Debtor, with distributions occurring as follows: $656,250.00 distributed to Creditor Z ($562,500.00 released from escrow plus *pro rata* share of Q7 distribution), and $93,750.00 distributed to remaining three creditors *pro rata*.

Q8: $187,500.00, distributed *pro rata* to all four creditors.

Identical distributions would be made for the next six quarters. Once the Q14 distribution in the aggregate amount of $187,500.00 is made, the total payments made by the Debtor would amount to $2,625,000.00.

Q15: $25,000.00, distributed *pro rata* to all four creditors.

Final distributions would occur in Q15, with no distribution occurring in Q16.

The Debtor and the holders of Allowed General Unsecured Claims would split the $50,000.00 reduction in the Allowed amount of general unsecured claims, and each party's share would be in an amount equal to $25,000.00 less fifty percent of the costs and expenses incurred by the Committee in prosecuting its objection to the claim of Creditor Z.

With regard to claims in low dollar amounts, the following illustration applies. If, of the four hypothetical creditors, the Allowed amount of the general unsecured claim of "Creditor Y" amounts to $16,000.00, then the total distribution payable to Creditor Y would be in the amount of $1,840.00 (i.e. 11.5% of $16,000.00). The Debtor may pay Creditor Y $1,840.00 in Q1 in full and final satisfaction of Creditor Y's claim rather than paying Creditor Y

$115.00 per quarter. The hypothetical distribution schedule would be as follows:

Q1: $187,500.00 paid by the Debtor and distributed as follows: $1,840.00 distributed to Creditor Y, $92,830.00 escrowed for Creditor Z, and $92,830.00 distributed to the remaining two creditors *pro rata*.

No further distributions would be made to Creditor Y, whose claim against the Debtor has been satisfied in full through the Q1 distribution.

Q2: $187,500.00 paid by the Debtor and distributed as follows: $93,750.00 escrowed for Creditor Z, and $93,750.00 distributed to the remaining two creditors *pro rata*.

Identical distributions would be made for the next four quarters.

Q7: $187,500.00 paid by the Debtor, with distributions occurring as follows: $655,330.00 distributed to Creditor Z ($561,580.00 released from escrow plus *pro rata* share of Q7 distribution), and $93,750.00 distributed to remaining two creditors *pro rata*.

Q8: $187,500.00, distributed *pro rata* to all three remaining creditors.

Identical distributions would be made for the next six quarters. Once the Q14 distribution in the aggregate amount of $187,500.00 is made, the total payments made by the Debtor would amount to $2,625,000.00.

Q15: $25,000.00, distributed *pro rata* to all three remaining creditors.

Final distributions would occur in Q15, with no distribution occurring in Q16.

Furthermore, and by agreement of the Committee and the Debtor, the Committee will not assert any chapter 5 claims against any party, and consents to the Debtor releasing all such claims. The Debtor also releases all chapter 5 claims as to any party.

In addition, the Committee does not object to the Plan and supports its confirmation.

*Main Street Loan Claim*. CNB filed a general unsecured claim (POC No. 78) against the Debtor in the amount of $9,877,601.41, which loan was made under the Main Street Priority Loan Facility (the "Main Street Loan"). The Main Street Loan is an Allowed General Unsecured Claim hereunder in the amount of $9,877,601.41 and is entitled to share in the distributions under the Plan to general unsecured creditors *pro rata*.

If the aggregate *pro rata* distribution paid on the Main Street Loan from the Debtor as an Allowed General Unsecured Claim under the Plan is less than $815,000.00, then RE PR will pay to CNB on account of the Main Street Loan the difference between $815,000.00 and such lower distribution amount, and, as additional New Value, Mr. Krantzberg will personally guarantee RE PR's obligation to make such payment.

As part of his New Value contributions and in addition to the above payments from the Debtor on the Main Street Loan, Mr. Krantzberg will separately pay an amount equal to $485,000.00 to CNB to be applied to the Main Street Loan (the "Krantzberg Payment") as set forth below, and to secure

45

his payment obligations, and as additional New Value, Mr. Krantzberg will grant CNB a security interest in any and all of the website(s) and domain names, and the proceeds and fees generated therefrom, that relate to the Debtor or the Reorganized Debtor and that are owned by Mr. Krantzberg or any of his affiliates.[13] As additional New Value, Mr. Krantzberg will pay the Krantzberg Payment to CNB as follows: (i) $75,000.00 per year for each of calendar years 2025 and 2026, which amount shall be paid in equal monthly installments commencing January 1st of each such year and continuing the same day of each month thereafter, and (ii) a balloon payment in the amount of $335,000.00 no later than December 31, 2026 (the "Balloon Payment").

If the aggregate *pro rata* distribution paid under the Plan as set forth above by the Reorganized Debtor on the Main Street Loan is greater than $815,000.00, then the Balloon Payment will be reduced by an amount equal to such excess (the "Krantzberg Credit"), provided however, that the Krantzberg Credit will not apply if the reason for any such excess distribution on account of the Main Street Loan above $815,000.00 relates to recoveries from litigation targets under the Plan. In other words, if litigation recoveries inflate the total funds payable to general unsecured creditors such that the *pro rata* distribution for the Main Street Loan exceeds $815,000.00, then Mr.

---

[13] Mr. Krantzberg's pledge of website(s), domain names, and proceeds and fees therefrom, is not intended to diminish or impair, and shall not be construed as diminishing or impairing, Mr. Krantzberg's provision of New Value to the Reorganized Debtor in the form of a waiver of Mr. Krantzberg's administrative claim for fees payable by the Debtor for the Debtor's use of pledged website(s) or domain name(s).

Krantzberg must make the full $335,000.00 Balloon Payment, which shall also constitute a further New Value contribution.

In addition to the above payments on the Main Street Loan from the Debtor and Mr. Krantzberg, the Debtor's subsidiary, RE PR, and the Debtor's supplier, Invicta, will each make separate payments on the Main Street Loan as follows. RE PR will pay an amount equal to $1,500,000.00 to CNB on the Main Street Loan over a period of 3 years as follows: (i) an amount equal to $35,000.00 per month for each of the calendar years 2024 and 2025, and (ii) an amount equal to $55,000.00 per month for calendar year 2026, with a balloon payment of all remaining amounts due on December 31, 2026 (the "RE PR Payment"). Such payments shall commence on the first day of the month following the month in which the Effective Date occurs under the Plan. Mr. Krantzberg, as part of his New Value contribution, will personally guarantee the RE PR Payment.

Invicta will pay to CNB an amount equal to $250,000.00 on account of the Main Street Loan over a period of 3 years, in equal monthly installments of $6,944.45, beginning on the first day of the month following the month in which the Effective Date occurs under the Plan and ending no later than December 31, 2026, with a balloon payment of all remaining amounts due on December 31, 2026.

Upon the indefeasible and timely payment in full to CNB of all amounts required to be paid on the Main Street Loan from the Debtor/Reorganized

Debtor, Mr. Krantzberg, RE PR and Invicta as set forth above, the Main Street Loan shall be deemed satisfied in full.  Upon the indefeasible and timely payment in full to CNB of all amounts required to be paid on the Class 2 secured claim of CNB and the Main Street Loan, in each case as set forth herein, the Debtor, the Reorganized Debtor, Invicta, Mr. Krantzberg, and RE PR will be forever released and discharged from any and all obligations on the Main Street Loan claim. Pending such payment in full, both the Invicta Subordination Agreement and the Newport Subordination Agreement (which is contained within the guarantee which Newport provided to CNB) will remain in full force and effect. To the extent not covered by the subordination agreements, and for the avoidance of doubt, (i) Newport will not receive any payments under the Plan or from any of the parties contributing to payments on the Main Street Loan until the CNB Class 2 secured claim and the Main Street Loan claim are paid in full according to the terms set forth above, and (ii) any payments that may be due to Invicta from the Debtor pursuant to the Plan and on account of Invicta's $30,000,000.00 claim as set forth shall be made directly to CNB on account of the Main Street Loan until the Main Street Loan is paid in full. Notwithstanding anything herein to the contrary, the releases proposed hereunder (i) between CNB and Invicta shall be solely as to claims related to the Debtor and shall not include a release of any claims that CNB has against Invicta related to any other matter, including existing loans from CNB to Invicta, and (ii) between CNB and each of the Debtor, the Reorganized

Debtor, Mr. Krantzberg, and RE PR shall not release or be deemed to release 405 Southwest Real Estate Company, LLC ("405") from its mortgage loan from CNB or any person or entity who entered into loan documents related thereto, including any existing guaranties of such mortgage loan by Mauricio Krantzberg, the Debtor and Retailing Enterprises PR.[14] If and to the extent the treatment of the Main Street Loan of CNB herein is inconsistent with the provisions of the Plan, then the provisions of this Order shall control.

      z.    <u>Class 16</u>. As to the Allowed Equity Interests in the Debtor, Mr. Krantzberg will retain his 100% equity interest in the Debtor/Reorganized Debtor by contributing "New Value" in the approximate amount of $5,055,161.67, in the form of (a) a waiver of Mr. Krantzberg's general unsecured claim of $786,661.67 against the estate; (b) a waiver of Mr. Krantzberg's administrative claim in the approximate amount of $714,000.00[15] against the estate; (c) a waiver of $239,500.00 which is owed by the Debtor to Mr. Krantzberg's wholly-owned company, 405[16]; (d) $2,500,000.00 as a capital infusion made by Mr. Krantzberg to the Reorganized Debtor, payable in 16

---

[14] For avoidance of doubt, the mortgage loan from CNB to 405 Southwest Real Estate Company, LLC (the "405 Mortgage") is in the original principal amount of $5,000,000.00 and is evidenced by a certain Loan Agreement, dated February 13, 2020, between CNB and 405 Southwest Real Estate Company, LLC, together with a promissory note, mortgage, pledge agreement and guarantees of, among others, Mauricio Krantzberg, the Debtor and Retailing Enterprises PR.

[15] Mr. Krantzberg is entitled to a monthly $95,500.00 licensing fee for the use of his website by the Debtor, pursuant to the RE Licensing Agreement as described in the Disclosure Statement. Such amount has not been paid during the pendency of this case and is accruing monthly.

[16] This amount would otherwise need to be paid in full as the Debtor is assuming this lease.

quarterly payments commencing on the Initial Payment Date and according to the schedule in **Exhibit "A" Plan Financials Section 12**, attached to the Disclosure Statement, and (e) Mr. Krantzberg's contributions to the Main Street Loan in the amount of $485,000.00 plus a backstop to Main Street's general unsecured distribution in the amount of $815,000.00. Further, Mr. Krantzberg is providing new personal guarantees covering over $4,500,000.00 in commercial lease and Main Street loan commitments[17].

6.    **Administrative Expenses**. With regard to the payment of administrative expenses as they relate to the following professionals: (1) Maria Yip, CPA and Yip Associates, Financial Advisors to the Official Committee of Unsecured Creditors ("Yip"); (2) Joshua Dobin, Esq. and Meland Budwick, P.A., counsel for the Official Committee of Unsecured Creditors ("Dobin"); and (3) Aaron Wernick, Esq. and Wernick Law, PLLC, counsel for the Debtor ("Wernick") (collectively, the "Professionals"), by agreement of the parties, any amounts that remain due and owing as of the Effective Date will be paid in the following manner, but only up to the amounts actually owed and awarded:

- $100,000.00 to be distributed pro rata in the month commencing on the Initial Payment Date (i.e., Month 1) amongst the 3 Professionals.

- $100,000.00 in Month 2, in the same manner.

- $200,000.00 in Month 3 and Month 4, in the same manner.

---

[17] The value of these personal guarantees is critical to the consummation of this plan and a successful reorganization of this Debtor. The numerical value of these guarantees has not been included in the New Value calculation above; notwithstanding, such commitments are vital to the reorganization process.

- Any outstanding amounts will be paid in full in Month 5.

- Mr. Krantzberg is providing a personal guarantee for the payment of the administrative expenses of Yip, Dobin, and Wernick.

By agreement of the parties, for the administrative expenses of Katie Goodman/GGG Partners, LLC, any outstanding amounts due from the Debtor shall be paid within 30 days of the Initial Payment Date.

By agreement of the parties, for the administrative expenses of Mary Pulcini/Pulcini and Nemet, CPAs, PA, any outstanding amounts due from the Debtor shall be paid within 90 days of the Initial Payment Date.

By agreement of the parties, the Debtor will pay Aventura Mall Venture attorney's fees and costs in the amount of $54,118.14 in 6 equal monthly payments of $9,019.69, commencing on the Initial Payment Date.

By agreement of the parties, the Debtor will pay 1535 Broadway LLC ("1535 Bway") an administrative expense for postpetition rent in the amount of $279,247.11, with payment of such administrative expense/rent claim to 1535 Bway in four (4) monthly installments of $69,811.78 per month, delivered to 1535 Bway on or before the following dates: February 15, 2024; March 15, 2024; April 15, 2024 and May 15, 2024.

7.    **Payments Pursuant to 28 U.S.C. § 1930(a)(6)**. The Debtor shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within ten days of the entry of this Order for pre-confirmation periods. The Debtor shall further pay the U.S. Trustee the appropriate sum required pursuant to 28

51

U.S.C. §1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. §1930(a)(6), based upon all post-confirmation disbursements made by the Debtor until the earlier of (a) the administrative closing of the case; (b) the closing of this case by the issuance of a Final Decree by the Bankruptcy Court; or (c) upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code. After the Confirmation Date, the Debtor shall file a quarterly Post-Confirmation Operating Report which shall include, among other things, all payments made under the Plan and payments made in the ordinary course of business. The Post-Confirmation Operating Report shall be filed quarterly until the Court enters a Final Decree, administratively closes the case, dismisses this case, or converts this case to another chapter in bankruptcy.

8. **Effect of Confirmation Order on Plan**. The failure to reference or address all or part of any particular provision of the Plan herein shall have no effect on the validity, binding effect, or enforceability of such provision, and such provision has the same validity, binding effect, and enforceability as every other provision of the Plan. To the extent that any inconsistencies exist between the terms of the Plan and this Confirmation Order, the terms of this Confirmation Order shall control.

9. **Documents Required to Effectuate Plan**. The Debtor is authorized to execute any and all documents reasonably required to effectuate the provisions of the Plan or prior Orders of the Court. On the Effective Date, all of the agreements of the various parties in interest required by the Plan and this Order, including Invicta,

Mr. Krantzberg and RE PR, shall be reflected in such documentation as is reasonably required by CNB, the execution and delivery of which shall be a condition precedent to the Effective Date of the Plan. The Court shall retain jurisdiction to enforce the terms of such agreements, including the requirement to document such agreements.

10. **Injunction and Discharge**. Upon the Effective Date and except as otherwise set forth in the Plan or this Order, all entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor are, with respect to any such Claim or Equity Interests, permanently enjoined from taking any of the following actions (other than to enforce any rights or obligations under the Plan): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor/Reorganized Debtor or any of its property; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any encumbrance of any kind against the Debtor/Reorganized Debtor; (iii) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor/Reorganized Debtor, or any of their property, except as contemplated or allowed by the Plan and in connection with ordinary course reconciliations and adjustments under the terms of its Assumed Leases; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (v) prosecuting or otherwise asserting any right, claim or cause of action against the Debtor/Reorganized Debtor, that has

been exculpated pursuant to the Plan; provided, however, that the injunction provided herein shall neither bar any entity from asserting any defense in an action commenced by or on behalf of the Debtor/Reorganized Debtor, nor prohibit any entity from asserting any right expressly preserved or contemplated by the Plan or this Confirmation Order.

Notwithstanding anything to the contrary herein, and the automatic stay, to the extent applicable, nothing shall modify the rights, if any, of any Holder of an Allowed Claim or any current or former party to an Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law with respect to undisputed amounts owing to or held by it, including (1) the ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Leases with the Debtor or any successors to the Debtor under the Plan; (2) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; (3) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtor, the Reorganized Debtor, or any successors to the Debtor; or (4) assertion of rights of setoff and/or recoupment in connection with periodic reconciliations in accordance with the terms of assumed Unexpired Leases.

Notwithstanding anything to the contrary in the Plan or this Order, non-debtor parties to executory contracts and unexpired leases that are assumed under the Plan need not file requests for payment of Administrative Claims and shall not be subject to the Administrative Claims Bar Date.

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Equity Interest shall be deemed to have specifically consented to the Injunctions set forth herein.

Moreover, so long as the Debtor, Mr. Krantzberg, RE PR, and Invicta are current on their payment obligations on CNB's Class 2 secured claim and on the Main Street Loan, CNB covenants not to sue or assert any claims, including avoidance claims under Chapter 5 of the Bankruptcy Code, against Mr. Krantzberg, Island Cabo SA, Newport, 405, or RE PR, provided that such agreement on behalf of CNB shall not apply to any defaults under the 405 Mortgage, including with respect to those parties liable on and/or who guaranteed the 405 Mortgage.

On the Effective Date and except as otherwise set forth in the Plan, the Debtor will be discharged from any debt that arose before confirmation of the Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt (i) imposed by or treated under the Plan; or (ii) to the extent provided in § 1141(d)(6).

11.    **Cross Default Under the Plan**. Any default by the Debtor under the Plan, including on its obligations to Invicta and on its payment obligations to CNB on its Class 2 secured debt and/or on the Main Street Loan, or any default by RE PR on its payment obligations to CNB for the Main Street Loan, shall constitute a cross-default of all obligations of the Debtor to all parties in interest under the Plan for all purposes.

12. **Releases**. Except as otherwise provided herein, including in the next paragraph, upon the Effective Date, without the need for execution or delivery of any additional documentation or orders of the Bankruptcy Court, and in exchange for valuable consideration of his contribution of New Value, as described in the treatment of Class 16 of the Plan and this Confirmation Order, Mr. Krantzberg and his affiliated entities Island Cabo SA, Newport, 405, 205, LLC, Watch Brand, and RE PR (collectively, the "Released Party") will be fully and finally released and forever discharged from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies, and demands, of every kind and nature whatsoever, in law or in equity, relating to the obligations of Debtor to any other person or entity, including but not limited to (i) any explicit or implicit guarantees of the Released Party for the obligations of the Debtor, unless such guarantees are specifically provided for in the Plan or this Confirmation Order, (ii) prepetition claims, interests, or rights which were, or could have been asserted, against the Debtor, and (iii) postpetition claims that could have been asserted against the Debtor prior to the confirmation of the Plan (collectively, the "Released Claims"), except as set forth below.

Notwithstanding anything in the Plan or herein to the contrary, the release provided for in this section shall not apply to and shall not release any obligations of Mr. Krantzberg and his affiliated entities, including Island Cabo SA, Newport, 405, 205, LLC, Watch Brand, and RE PR (i) under this Plan, (ii) to CNB in respect of its

secured claim in Class 2, including any and all loan documents evidencing or securing

such secured claim, (iii) to CNB in respect of the Main Street Loan as set forth herein,

including under any and all loan documents evidencing such Main Street Loan, or

(iv) under the 405 Mortgage and any and all loan documents evidencing and/or

securing the 405 Mortgage.

    If and to the extent the release provisions of this Order are inconsistent with

the release provisions of the Plan, then the release provisions of this Order shall

control.

    13.   **Exculpation**. Except as specifically provided in the Plan or this

Confirmation Order, neither the Debtor, nor its employees, representatives,

members, advisors, attorneys, accountants, financial advisors, or agents, or any of

such parties' successors or assigns, shall have or incur, and are hereby released from,

any claim, obligation, cause of action or liability to one another or to any holder of a

claim or interest, or any other party in interest, or any of their respective officers,

directors, shareholders, members, employees, representatives, advisors, attorneys,

accountants, financial advisors, agents, or affiliates, or any of their successors or

assigns, for (i) any prepetition act taken or omitted to be taken in connection with,

related to or arising from authorizing, preparing for, or filing the Chapter 11 Case,

(ii) any act or omission in connection with, relating to, or arising out of the Chapter

11 Case, (iii) the negotiation and pursuit of confirmation of the Plan, (iv) the

consummation of the Plan, (v) the administration of the Plan, or (vi) the property to

be distributed under the Plan, except for their gross negligence, willful misconduct,

or actual fraud, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under the Plan.

The Committee, its representatives, members, advisors, attorneys, accountants, financial advisors, and agents, or any of such parties' successors or assigns, shall neither have nor incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, agents, or affiliates, or any of their successors or assigns, for (i) any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, (ii) the negotiation and pursuit of confirmation of the Plan, (iii) the consummation of the Plan, (iv) the administration of the Plan, or (v) the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or actual fraud, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under the Plan.

14.    **Final Decree as to the Debtor and Closing of the Case**. Upon substantial consummation of the Plan, the Debtor shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such final decree on its own motion.

15.    **Re-vesting of Property**. Under 11 U.S.C. § 1141(b), except as otherwise provided in the Plan or in this Confirmation Order, as of the Effective Date, all of the property of the estate vests in the Debtor. Except as provided in §§ 1141(d)(2)

58

and (3) and except as otherwise provided in the Plan or in this Order, after confirmation of the Plan, the property dealt with by the Plan is free and clear of all claims and interests of creditors and equity security holders.

16. **Post-Confirmation Structure**. Upon the Effective Date, Debtor's management shall remain unchanged, in that Mauricio Krantzberg shall remain the sole manager and 100% interest holder of the Debtor and shall continue to act as president of the Debtor/Reorganized Debtor. All matters provided for under the Plan involving the corporate structure of the Debtor, Reorganized Debtor, or any corporate action to be taken by or required of the Debtor or Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the Debtor or Reorganized Debtor.

Subject to any requirement of the Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the officers, partners, directors, members and managers, as the case may be, of the Debtor immediately prior to the Effective Date shall be deemed to be the officers, partners, directors, members, and managers of the Reorganized Debtor without any further action by any party.

As of the Effective Date, the Debtor may use, acquire, and dispose of its assets, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order. All privileges with respect to the assets of the Debtor's estate, including the

attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Debtor or the Reorganized Debtor, as the case may be.

17.    **Disbursing Agent**. Mr. Krantzberg shall be the disbursing agent and make all payments under the Plan.

18.    **Terms of this Order Governs**. If and to the extent any term of the Plan is inconsistent with the terms of this Order, then the terms of this Order shall control, it being intended that the terms of this Order shall be deemed to amend the Plan to the extent of any such inconsistency.

19.    **Jurisdiction**. The Bankruptcy Court shall retain such jurisdiction as is legally permissible over the reorganization case for the following purposes:

    a.  to hear and determine any and all objections to the allowance of any Claim or any controversy as to the classification of Claims;

    b.  to hear and determine any and all applications for compensation and reimbursement of expenses to professionals as well as to hear and determine claims entitled to priority under Section 507(a)(1) of the Bankruptcy Code;

    c.  to enable Debtor to prosecute any and all proceedings which may be brought to set aside liens or encumbrances and to recover any transfers, assets, properties, or damages to which Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other Federal, State or local laws; including causes of action,

60

controversies, disputes, and conflicts between Debtor and any other party, including but not limited to any causes of action for objections to claims, preferences or fraudulent transfers and obligations or equitable subordination; and to enter any order assuring that good, sufficient and marketable legal title is conveyed to the purchaser of Debtor's property;

d.  to consider any necessary valuation issues under Section 506 of the Bankruptcy Code, and any proceeding to determine the amount, validity, and priority of liens, in connection with Debtor's property;

e.  to determine the rights of any party in respect of the assumption or rejection of any executory contracts or unexpired leases;

f.  to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan;

g.  to modify this Plan after the Confirmation Date, pursuant to the Bankruptcy Code;

h.  to enforce and interpret the terms and conditions of the Plan;

i.  to enter orders to enforce the title, rights, and power of the Estate as the Court may deem necessary; and

j.  to enter orders concluding and closing this case.

20. **Post-Confirmation Status Conference**. The Court shall conduct a post-confirmation status conference on April 17, 2024 at 2:30 p.m. at the U.S.

Courthouse, 299 E. Broward Blvd., Courtroom 308, Fort Lauderdale, Florida 33301.

###

Submitted by:
Aaron A. Wernick, Esq.
Wernick Law, PLLC
*Attorneys for the Debtor*
2255 Glades Road, Suite 324A
Boca Raton, FL 33431
(561) 961-0922
awernick@wernicklaw.com

*Aaron A. Wernick, Esq. must serve a copy of the signed order on all parties served with the Plan and Disclosure Statement and must file with the court a certificate of service conforming with Local Rule 2002-1(F).*